**WESTSIDE MOTHERS, et al., Plaintiffs,**

v.

**James K. HAVEMAN, et al., Defendants.**

**No. 99–CV–73442–DT.**

United States District Court, E.D. Michigan, Southern Division.

March 26, 2001.

Marilyn T. Mullane, Susan McParland Nash, Michigan Legal Services, Detroit, MI, Jennifer Clarke, Jacob Kobrick, Michael Doluisio, Robin Sumner, Dechert, Price & Rhoads, Thomas Gilhool, Philadelphia, PA, Lourdes Rivera, Jane Perkins, National Health Law Program, Los Angeles, CA, for Plaintiffs.

Erica W. Marsden, Michigan Dept. of Atty. Gen., Social Services Div., Lansing, MI, for Defendant.

Jeffrey S. Sutton, Jones, Day Reavis & Pogue, Columbus, OH, Howard C. Nielson, Jr., Jones, Day, Reavis & Pogue, Washington, DC, for Movant.

## OPINION AND ORDER DENYING PLAINTIFFS' MOTION TO CERTIFY CLASS, AND GRANTING DEFENDANTS' MOTION TO DISMISS

CLELAND, District Judge.

### I. Introduction

In this case, Plaintiffs' stated goal is to ensure that economically disadvantaged children throughout the State of Michigan obtain adequate medical care. The court can safely say that the endeavor is commendable. Having a virtuous goal in sight, however, does not endow a court with the power to hear a case, nor create a cause of action where none exists. In this case, neither jurisdiction nor a cause of action obtains.

Plaintiffs seek injunctive relief and the appointment of a special master to end the State of Michigan's ("Michigan" or "the State") alleged systemic deprivation of Early and Periodic Screening, Diagnosis, and Treatment Services ("EPSDT services"), which is part of the State's Medicaid or "Medical Assistance" program. The named plaintiffs are two organizations,[1] Families on the Move and Westside Mothers, and eight putative class representatives.[2] The named defendants are two State officials purportedly responsible for administering Michigan's EPSDT services; however, because the State of Michigan is the entity actually responsible for providing the contested EPSDT services, the court will refer to Michigan as the defendant. Plaintiffs bring their case under 42 U.S.C. § 1983, claiming that Michigan has failed to provide EPSDT services mandated by 42 U.S.C. § 1396, et seq., to the class of all Michigan children eligible for those services.

On November 9, 1999, Michigan moved for dismissal or, alternatively, for summary judgment, which both parties then addressed in written briefs. On December 21, 1999, the court sua sponte ordered the parties to further address in briefing certain threshold issues not raised in the initial round of briefing pertaining to the nature of the relationship between the federal government and the State under the Medicaid program, the plaintiffs' standing under § 1983 to bring suit against Michigan, and whether Michigan was legally amenable to suit. A second round of briefing ensued. Finding the State's discussion of these issues to be less than fully satisfactory, the court invited and accepted the participation of the Michigan Municipal League ("the League") as amicus curiae to address the issues raised by the court.[3]

---

1. The court dismissed four other organizations originally named as plaintiffs for lack of organizational standing on December 28, 1999.

2. Pending before the court is Plaintiffs' October 14, 1999 "Motion for Class Certification," which will be denied as moot.

3. The court commends the efforts by the respective counsel in this case to address the many complex issues raised in this case. Particularly noteworthy for its quality and helpfulness is the amicus participation at the court's request of the League and its pro bono counsel, Mr. Jeffrey Sutton, of Jones, Day, Reavis and Pogue in Columbus, Ohio, for whose assistance the court here expresses its gratitude.

Based upon the League's participation, a third round of briefing occurred, culminating in a hearing on August 14, 2000. At the hearing, Michigan adopted all of the League's arguments as its own, and the court will treat them as such in this order.

Given the length and complexity of the matters considered, a summary of the Court's opinion is in order. Plaintiffs' suit raises, in essence, two threshold issues that must be addressed before the court may consider the merits of their claims. First, does the court have jurisdiction over this suit, which is directed in substance at the State of Michigan, an entity that is ordinarily immune from suit? Second, even if such jurisdiction exists, is there a cause of action permitting plaintiffs to sue in the State or its officers in order to enforce the rights asserted? The court's review of these questions indicates that both are to be answered in the negative. The court's analysis is organized as follows:

Part II of this opinion provides an overview of the Medicaid EPSDT program at issue in this litigation. Part III explains the constitutional dimension of the Federal government's and Michigan's relationship under the Medicaid program, and why that relationship is necessarily contractual under the Constitution's Spending Clause. In Part IV, the court explains that it lacks jurisdiction over this case because Michigan is the real defendants, and therefore possesses sovereign immunity against suit. Plaintiffs' attempt to circumvent that immunity under the *Ex parte Young* by suing Michigan's officers fails for at least four different reasons, each of which is separately explained. Even assuming that *Ex parte Young* was applicable to the instant case, Part V explains that § 1983 does not create a cause of action to sue states or their officers under Spending Power programs, and that the statute also does not operate as an independent means by which sovereign immunity may be overcome if *Ex parte Young* is unavailable. Three distinct reasons concerning the interpretation

of § 1983 foreclose its use as envisioned by plaintiffs, and each is discussed in Part V. Plaintiffs' assertions that the court's analyses are foreclosed by prior jurisprudence concerning Spending Clause programs are addressed in Part VI; a handful of other issues are discussed in Part VII; and the court's conclusion is found in Part VIII.

## II. Background

The Supreme Court has described the Medicaid program at issue in this litigation:

> [It] was created in 1965, when Congress added Title XIX to the Social Security Act, 79 Stat. 343, as amended, 42 U.S.C. § 1396 *et seq.* (1976 ed. and Supp. II) for the purpose of providing federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons. Although participation in the Medicaid program is entirely optional, once a State elects to participate, it must comply with the requirements of Title XIX.

*Harris v. McRae*, 448 U.S. 297, 301, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980). In other words, a State may either "comply[ ] with the conditions set forth in the Act or forego[ ] the benefits of federal funding." *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 11, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) (internal citations omitted) ("*Pennhurst I* ").

■ The Act creates a "cooperative federal-state program" entitled "Grants to States for Medical Assistance Programs" to provide statutorily-authorized health care services to economically disadvantaged individuals. *See* 42 U.S.C. § 1396 *et seq.; Wilder v. Virginia Hospital Ass'n,* 496 U.S. 498, 502, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990). If a State elects to participate in the Medicaid program, it must submit to the Secretary of Health and Human Services ("HHS") a state plan describing the scope of its medical assistance program, which will be administered by the State itself. *See* 42 U.S.C. § 1396a(b). Upon approval of the plan,

the Secretary allocates financial grants to help defray its cost. *See* 42 U.S.C. § 1396b; *Harris,* 448 U.S. at 308, 100 S.Ct. 2671. Michigan is authorized to participate in the Medicaid program pursuant to §§ 105–112e of the Michigan Social Welfare Act, M.C.L. §§ 400.105–400.112e. As previously mentioned, once a State agrees to participate in the Medicaid program, the requirements of Title XIX and the regulations promulgated thereunder become mandatory and binding upon the state. *See Wilder,* 496 U.S. at 502, 110 S.Ct. 2510; *Boatman v. Hammons,* 164 F.3d 286, 288 (6th Cir.1998) (citing 42 C.F.R. § 430.10 and *Harris,* 448 U.S. at 301, 100 S.Ct. 2671).

A State's plan must provide "assurance that [it] will be administered in conformity with the specific requirements of Title XIX, the regulations [promulgated thereunder] and other applicable official issuances of [HHS]." 42 C.F.R. § 430.10. Michigan's "State Plan Under Title XIX of the Social Security Act," includes such assurances of conformity. From time to time, Michigan submits plan amendments to the Secretary, as described at 42 C.F.R. § 430.12(c), to reflect changes in law or in the State's operation of its Medicaid program.

The Secretary retains the authority to monitor each participating State's performance, and to terminate or limit payments to the state if the Secretary finds less than substantial compliance with any plan provision:

> [T]he Secretary shall notify such State agency that further payments will not be made to the State (or, in his discretion), that payments will be limited to categories under or parts of the State plan not affected by such failure, until the Secretary is satisfied that there will no longer be any such failure to comply. Until he is so satisfied he shall make no further payments to such State (or shall limit payments to categories under or parts of

the State plan not affected by such failure).

42 U.S.C. § 1396c. The parties to the instant case agree that withholding funds from noncompliant states is the exclusive means by which the federal government may enforce the terms of the program, and that the federal government may not compel compliance through litigation.[4] Furthermore, the Medicaid statute contains no provision permitting Medicaid-eligible beneficiaries to bring suit against noncompliant states. There are, however, procedures that grant hearings to individuals who believe that they have been wrongfully denied care. To this end, every Medicaid provider in Michigan must incorporate an internal administrative grievance procedure as a condition of its contract with the State. Moreover, Michigan also maintains an administrative hearing mechanism by which Medicaid-eligible individuals can complain to a county department of social welfare about the quality or level of care provided. *See* M.C.L. §§ 400.37, 400.9. Those administrative decisions may be appealed to the county circuit court. *See* M.C.L. §§ 400.37.

Turning to the actual services provided, a State's agreement to participate in the Medicaid program obligates it to provide medical assistance to eligible individuals by paying for part or all of the costs of certain statutorily-enumerated medical services. *See* 42 U.S.C. §§ 1396, 1396d(a). The enumerated services for which the State must pay include EPSDT services, *see* 42 U.S.C. § 1396d(a)(4)(B), which are further defined at 42 U.S.C. § 1396d(r).

Plaintiffs' detailed, five-count complaint asserts that Michigan has failed, and continues to fail, to meet its mandatory EPSDT obligations under the Medicaid program, as set forth by statute, regulations, and HHS directives. To sum up plaintiffs' complaints, they allege that Michigan has failed to ensure that Medic-

---

**4.** The parties have not addressed whether other remedies are available to the federal government, such as administrative recoupment of misspent funds or overpayments.

aid-eligible children in the State receive (1) EPSDT screening services required by 42 U.S.C. §§ 1396a(a)(43) and 1396d(r)(1)(A) and (B), 42 C.F.R. § 441.57, and various HHS policy directives; (2) EPSDT treatment services required by 42 U.S.C. § 1396d(r)(5) and 42 C.F.R. pt. 441; (3) basic child health care outreach and information required by 42 U.S.C. § 1396a(a)(43), 42 C.F.R. § 441.56, and various HHS policy directives; (4) assistance in scheduling EPSDT services[5] as required by 42 U.S.C. § 1396a(a)(43)(b) and 42 C.F.R. § 441.62(b). Plaintiffs also allege that Michigan has (5) failed to secure capacity to deliver the EPSDT services required by Title XIX as mandated by 42 U.S.C. §§ 1396a(a)(8), 1396a(a)(30)(A) and 1396u–2(b)(5). Because the Medicaid statute itself does not contain a private cause of action, plaintiffs bring their complaint under 42 U.S.C. § 1983, alleging that the Michigan state officers purportedly responsible for implementing the State's Medicaid program have acted and continue to act under color of state law to deprive plaintiffs of their clearly established rights under the federal Medicaid program.

### III. The Nature of the Relationship Between Michigan and the Federal Government Under the Medicaid Program

■ It is a bedrock of constitutional law that the federal government is one of limited and enumerated powers. The Tenth Amendment enshrines this principle, and the Amendment itself reiterates that which is already obvious from the Constitution's structure: "If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States; if a power is an attribute of state sovereignty

reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress." *New York v. United States,* 505 U.S. 144, 156, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (internal citations omitted). In fact,

> the Tenth Amendment "states but a truism that all is retained which has not been surrendered." As Justice Story put it, "this amendment is a mere affirmation of what, upon any just reasoning, is a necessary rule of interpreting the constitution. Being an instrument of limited and enumerated powers, it follows irresistibly, that what is not conferred, is withheld, and belongs to the state authorities." This has been the [Supreme] Court's consistent understanding: "The states unquestionably do retain a significant measure of sovereign authority . . . to the extent that the Constitution has not divested them of their original powers and transferred those powers to the Federal Government."

*Id.* (internal citations and punctuation omitted).

■ No constitutional provisions exist that permit the federal government to require States or their officers to become instruments of federal policy.[6] *See Printz v. United States,* 521 U.S. 898, 935, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997). "While Congress has substantial powers to govern the Nation directly, including in areas of intimate concern to the States, the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *New York,* 505 U.S. at 162, 112 S.Ct. 2408 (internal citation omitted). As the *Printz* Court explained:

> The Framers' experience under the Articles of Confederation had persuaded

---

5. The portion of Count IV of plaintiff's complaint concerning Michigan's alleged failure to meet its EPSDT transportation obligations under 42 U.S.C. § 1396a(a)(43)(b) and 42 C.F.R. § 441.62(a) was dismissed on December 21, 1999 as barred by collateral estoppel and res judicata.

6. The notable exception to this rule, of course, is state judicial officers, who are expressly obligated under Article VI of the Federal Constitution to uphold federal law. *See Testa v. Katt,* 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947).

them that using the States as instruments of federal governance was both ineffectual and provocative of federal-state conflict. Preservation of the States as independent political entities being the price of union, and "the practicality of making laws, with coercive sanctions, for the States as political bodies" having been, in Madison's words, "exploded on all hands," the Framers rejected the concept of a central government that would act upon and through the States, and instead designed a system in which the State and Federal Governments would exercise concurrent authority over the people—who were, in Hamilton's words, "the only proper objects of government." We have set forth the historical record in more detail elsewhere, and need not repeat it here. It suffices to repeat the conclusion: "the Framers explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States." The great innovation of this design was that our citizens would have two political capacities, one state and one federal, each protected from incursion by the other—a legal system unprecedented in form and design, establishing two orders of government, each with its own direct relationship, its own privity, its own set of mutual rights and obligations to the people who sustain it and are governed by it. The Constitution thus contemplates that a State's government will represent and remain accountable to its own citizens. As Madison expressed it: "The local or municipal authorities form distinct and independent portions of the supremacy, no more subject, within their own spheres, to the general authority than the general authority is subject to them, within its own sphere."

*Printz,* 521 U.S. at 919–21, 117 S.Ct. 2365 (internal citations and punctuation omitted).

Accordingly, while Congress can enact programs pursuant to its constitutionally enumerated powers and enforce them through federal officers, it cannot require the States to legislate pursuant to its directions, nor order the States to implement a solution to a congressionally-denoted problem. *See Printz,* 521 U.S. at 926, 117 S.Ct. 2365 (citing *New York,* 505 U.S. at 175–76, 188, 112 S.Ct. 2408). Nor can Congress achieve its otherwise legitimate aims by altogether ignoring State legislatures and dragooning State officers into becoming federal program administrators. *See Printz,* 521 U.S. at 928, 117 S.Ct. 2365. However, Congress can, as it has done with the Social Security retirement program, create a federal program implemented through federal officers that directly regulates individual behavior. But it cannot impress the States, either directly or though their officers, into the service of a federal program.[7] Neither party to this case contests these basic propositions.

Of course, the foregoing strictures do not prevent Congress from acting to influence the States' behavior by means short of outright coercion. One such means, which is indisputably at the core of this litigation, is Congress' ability to use its spending power as an incentive "by which [it] may urge a State to adopt a legislative program consistent with federal interests." *New York,* 505 U.S. at 166, 112 S.Ct. 2408. As the Supreme Court has explained:

> The Constitution empowers Congress to "lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." Art. I, § 8, cl. 1. Incident to this power, Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power to further broad policy objectives by conditioning receipt of federal moneys upon compliance by

---

7. Not included within this prohibition is Congress' express power delineated in Article I, Section 8 of the Federal Constitution to call forth the State militias to "execute the Laws of the Union, suppress Insurrections and repel Invasions."

the recipient with federal statutory and administrative directives.

*South Dakota v. Dole*, 483 U.S. 203, 206, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987) (internal citations and quotations omitted). In discussing the contours of Congress' authority to legislate pursuant to the spending power, the Court has

[l]ong recognized that Congress may fix the terms on which it shall distribute federal money to the States. Unlike legislation enacted under § 5 [of the Fourteenth Amendment], however, legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the "contract." There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously. By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation.

*Pennhurst I*, 451 U.S. at 17, 101 S.Ct. 1531 (internal citations omitted). The Medicaid program at issue in this litigation is assuredly just such a contract. *See, e.g., Pennhurst I*, 451 U.S. at 12–15, 101 S.Ct. 1531.

█ While Congress possesses no power to order the Michigan legislature or Michigan officials to participate in the Medicaid program, it has offered financial incentives for them to do so. In return for federal funds, Michigan has agreed to adhere to the requirements set forth in federal statutes, regulations, and HHS directives. Justice Scalia's concurrence on this topic in *Blessing v. Freestone*, 520 U.S. 329, 117 S.Ct. 1353, 137 L.Ed.2d 569

(1997) is illustrative of the legal relationships created under the Medicaid program. There, he explained that federal-state spending power programs are "much in the nature of a contract" because:

The State promises to provide certain services to private individuals, in exchange for which the Federal Government promises to give the State funds. In contract law, when such an arrangement is made (A promises to pay B money, in exchange for which B promises to provides services to C), the person who receives the benefit of the exchange of promises between the two others (C) is called a third party beneficiary.

*Blessing*, 520 U.S. at 349, 117 S.Ct. 1353 (Scalia, J. concurring). In short, the Medicaid program is a contract between Michigan and the Federal Government, and Medicaid recipients are third-party beneficiaries of that contract. However, as the previous excerpt from *Pennhurst I* makes clear, all contract requirements must be unambiguous, and Michigan must have accepted them knowingly and voluntarily if there is to be any legally-cognizable expectation that it abide by them.

Plaintiffs ardently object to the characterization of the Medicaid federal-state cooperative agreement as a "contract." They note, correctly, that *Pennhurst I* and its progeny refer to programs enacted pursuant to the spending power as being "in the nature of the contract." The Court's use of such qualified language instead of outrightly referring to such programs as "contracts", they suggest, makes the term merely metaphorical. Plaintiffs posit that:

[T]he Court is employing the poetic devices of analogy and simile to emphasize that, as in contract law, the statute must be clear as to what it requires and that participation by the State is voluntary. *See Pennhurst*, 451 U.S. at 17, 101 S.Ct. 1531 ("by insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cog-

nizant of the consequences of their participation").

(Pl. Feb. 7, 2000 Br. at 6.) That such programs are "in the nature of a contract," they argue, suggests that the Medicaid program is much in the nature of "something else" as well. According to plaintiffs, that "something else" is that the statute in question is a "law," not a mere contract.

But plaintiffs' theory begs the question. No one disputes that the Medicaid program is authorized by federal statute. All laws enacted by Congress, however, are not of equal force. As previously explained, had Congress chosen to impose the Medicaid program directly on the citizenry as it did with the Social Security retirement program, participants could be compelled by law to conform with its strictures. But no such compulsion is available to the federal government when it chooses to act through the States. The participation of each sovereign is purely voluntary; indeed, as plaintiffs point out through their reliance on *Pennhurst I*, the agreement consists of no more than what the State unambiguously agrees to do. Were the arrangement binding "law" (the connotation presumably being the exercise of federal sovereign power under the Supremacy Clause), and not a contract, there would be no need for the State's participation to be knowingly voluntary.

Because the State's participation in the Medicaid program is consensual and not compelled by the Constitution, it is contractual in nature. The significant variation from an ordinary contract results from the sovereign status of the parties, which limits the remedies each has against the other. Under ordinary contract law, if the parties to the contract were individuals, A could sue B for specific performance under some circumstances. Under the program at issue in this litigation, both parties agree that the federal government lacks any such power to sue Michigan for specific performance because the Medicaid statute does not provide that remedy. In other words, because the contract is between sovereigns and not individuals, the "contractual nature" of the relationship is more, not less, truncated that it would be in a purely private contract. Recognizing that it is the nature of the participants to this contract that forecloses the availability of certain remedies, the court must examine the Medicaid contract between the Federal Government and Michigan according to its overt terms to determine whether its third-party beneficiaries may sue Michigan for nonperformance.[8]

In all events, it is clear beyond cavil that for the judiciary to enforce against Michigan a federal program requirement that does not meet the *Pennhurst I/South Dakota* criteria would be to do that which the Constitution forbids: namely, conscript a State in furtherance of a federal policy without its consent, on the basis of a constitutionally unenumerated (and therefore nonexistent) congressional power. Congress may not force States into being its agents; Congress may offer incentives for the States to do so long as the requirements of the State's participation are expressly set out. Derivative of the foregoing proposition, and of utmost importance for purposes of this litigation, is the notion that "'the mere receipt of federal funds cannot establish that a State has consented to suit in federal court.'" *Seminole Tribe*, 517 U.S. at 59, 116 S.Ct. 1114 (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 246–47, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985)). Recognizing these constitutional constraints, two crucial questions are posed: First, does the Med-

8. Even assuming, *arguendo*, that the Medicaid program is a "contract"—which plaintiffs do not concede—the parties heavily dispute whether EPSDT-eligible children are third-party beneficiaries to the contract, and even if they are, whether they are properly character-ized as "incidental" or "intentional" beneficiaries. For purposes of the analyses in this opinion, the court will assume, without so holding, that they are intentional third-party beneficiaries of the contract.

icaid program operate to waive Michigan's sovereign immunity as a matter of constitutional law? This issue will be addressed in Part IV. Second, did Congress unambiguously condition its Medicaid funding contract with Michigan upon the State's consenting to be sued by Medicaid beneficiaries? This issue will be addressed in Part V.

## IV. Whether Michigan and/or its Officers Retain Sovereign Immunity From Suit by Private Parties

■■■ The Eleventh Amendment to the United States Constitution states:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

The Eleventh Amendment is understood "to stand not so much for what it says, but for the presupposition which it confirms." *Kimel v. Florida Bd. Of Regents*, 528 U.S. 62, 120 S.Ct. 631, 640, 145 L.Ed.2d 522 (2000) (internal citations and punctuation omitted). Put simply, that presupposition is that "the Constitution does not provide for federal jurisdiction over suits against nonconsenting States." *Id.* (internal citations omitted). "Even when the Constitution vests in Congress complete lawmaking authority over a particular area, the Eleventh Amendment prevents congressional authorization of suits by private parties against unconsenting States." *Id.* at 643

(internal citations and quotations omitted). In particular, this absence of congressional power applies to the exercise of its enumerated powers under Article I, which means that Congress possesses no authority under Article I "to subject States to suit at the hands of private individuals." *Id.* at 644. Because the Medicaid program at issue in the instant suit is an exercise of Congress' Article I spending power, Congress may not unilaterally subject Michigan to suit by virtue of the State's participation in the program. In other words, participation alone does not connote consent to suit.

■■ However, Michigan's sovereign immunity from suit is not absolute. The Supreme Court has recognized two circumstances in which an individual may sue a State:

First, Congress may authorize such a suit in the exercise of its power to enforce the Fourteenth Amendment—an Amendment enacted after the Eleventh Amendment and specifically designed to alter the federal-state balance. Second, a State may waive its sovereign immunity by consenting to suit.

*College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 119 S.Ct. 2219, 2223, 144 L.Ed.2d 605 (1999) (internal citations omitted). In this case, neither party asserts that Fourteenth Amendment abrogation is implicated.[9]

Whether Michigan has consented to suit is a more complicated question. As ex-

---

**9.** It is difficult to imagine how it might be, in light of the Supreme Court's apparent holding in *Kimel* that § 5 of the Fourteenth Amendment, at most, grants Congress the authority to abrogate State sovereign immunity only in the areas of racial and gender discrimination. *See Kimel*, 120 S.Ct. at 644–46 (holding that § 5 does not grant Congress the power to abrogate sovereign immunity to prevent age discrimination). Even in the absence of *Kimel*'s substantive limitation of § 5, § 5 still would likely be of no aid to plaintiffs. The Court has held that when Congress intends to impose legislation on a state without the state's consent and intrude on traditional

state authority, the legislation must contain a specific statement of intent that Congress is acting under its § 5 powers. *See Gregory v. Ashcroft*, 501 U.S. 452, 469–70, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) (citing *Pennhurst I*, 451 U.S. at 16, 101 S.Ct. 1531 (holding that in the absence of a statement of congressional intent to act under § 5, the Court would assume that Congress was acting solely under the Spending Power)). No such statement of intent in the Medicaid statutes has been brought to the court's attention. Moreover, the issue is not before the court, and will not be addressed here.

plained in Part III, *supra*, mere receipt of federal funds alone does not effectuate a waiver, and waiver of sovereign immunity pursuant to the Federal–State Medicaid contract occurs only if that condition is expressly stated as a contractual term. Michigan asserts that it has not waived its immunity here; but plaintiffs posit that Michigan's acquiescence is irrelevant because plaintiffs sue not the State, but its officers, under the doctrine of *Ex parte Young*.

■■■ The *Young* doctrine permits prospective injunctive relief against state officials in certain circumstances, even when the State itself is immune from suit. *See Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). As the Supreme Court explained, the doctrine applies in instances where:

> [a]n official claims to be acting under the authority of the state. The act to be enforced is unconstitutional; and if it be so, the use of the name of the state to enforce an unconstitutional act to the injury of complainants is a proceeding without the authority of, and one which does not affect, the state in its sovereign or governmental capacity. It is simply an illegal act upon the part of the state official in attempting, by the use of the name of the state, to enforce a legislative enactment which is void because unconstitutional. If the act which the state [official] seeks to enforce be a violation of the Federal Constitution, the officer, in proceeding under such enactment, comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The state has no power to impart to him any immunity from responsibility to the supreme authority of the United States.

*Id.* at 159–60, 28 S.Ct. 441. Although *Young* itself concerned an alleged constitutional violation, the doctrine ordinarily also extends to violations of federal statutory law. *See, e.g., Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 281, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997).

■■■ The *Young* exception to State sovereign immunity is a "legal fiction" "adopted as necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to 'the supreme authority of the United States.'" *Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 102–03, 105, 114 n. 25, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) ("*Pennhurst II*") (citing *Young*, 209 U.S. at 160, 28 S.Ct. 441). As the Court explained in *Green v. Mansour*, 474 U.S. 64, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985):

> [T]he availability of prospective relief of the sort awarded in *Ex parte Young* gives life to the Supremacy Clause. Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law.

*Green*, 474 U.S. at 68, 106 S.Ct. 423 (internal citations omitted).

■■■ In other words, a state officer ostensibly acting under state law that contravenes the Constitution—or congressional enactments that are the supreme law of the land by dint of the Constitution's Supremacy Clause—acts with no lawful authority at all. Where federal law is supreme, the states are powerless to authorize their officials to act in defiance of it. However, the *Young* doctrine is limited in its scope of available relief, and at most may permit a federal court to grant prospective injunctive relief against State officers who are violating supreme federal law. *See Pennhurst II*, 465 U.S. at 102–104, 104 S.Ct. 900 (internal citations omitted). Accordingly, the doctrine is available only where plaintiffs can demonstrate not only that a state official is violating federal law, but that the law in question is the supreme law of the land.

■■■ In the instant case, the *Ex parte Young* doctrine is inapplicable for at least

four reasons, which will be discussed hereafter.

## A. Spending Power Programs are Not the Supreme Law of the Land.

 The instant case falls outside the ambit of the *Ex parte Young* doctrine because the doctrine does not apply to congressional enactments under the Spending Power. As described in Part III, supra, such programs are contracts consensually entered into by the States with the Federal Government, and not statutory enactments by which States must automatically submit to federal prerogatives. To be sure, the Supreme Court has in the past held that federal-state cooperative programs enacted under the Spending Power fall within the ambit of the Supremacy Clause. *See, e.g., Blum v. Bacon,* 457 U.S. 132, 138, 145–46, 102 S.Ct. 2355, 72 L.Ed.2d 728 (1982); *Carleson v. Remillard,* 406 U.S. 598, 600, 92 S.Ct. 1932, 32 L.Ed.2d 352 (1972); *Townsend v. Swank,* 404 U.S. 282, 285–86, 92 S.Ct. 502, 30 L.Ed.2d 448 (1971). In those cases, the Court asserted, without analysis, that the Supremacy Clause amounted to *carte blanch* authority for Congress to invalidate state laws, regardless of the source of the congressional power.

In more recent years, however, the Supreme Court has conducted a more searching analysis of the nature and extent of the Supremacy Clause.[10] In *Alden v. Maine,* 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999), the Court analyzed the scope of the Supremacy Clause, and held that:

> As is evident from its text … the Supremacy Clause enshrines as "the supreme Law of the Land" only those federal Acts that comport with the constitutional design. Appeal to the Supremacy Clause alone merely raises the question whether a law is a valid exer-

cise of the national power. *See* The Federalist No. 33, at 204 (A. Hamilton) ("But it will not follow from this doctrine that acts of the larger society which are not pursuant to its constitutional powers, but which are invasions of the residuary authorities of the smaller societies, will become the supreme law of the land").

*Id.* at 2254 (internal citations omitted). As the Court earlier noted in *Printz,* a reliance on the Supremacy Clause as the source of federal authority "merely brings us back to the question" of whether Congress has the enumerated authority in the first instance to enact that which is asserted to be supreme. *Printz,* 521 U.S. at 924–25, 117 S.Ct. 2365. Put another way, federal law cannot be supreme in an area in which Congress lacks an enumerated power to legislate. *See also Gregory,* 501 U.S. at 460, 111 S.Ct. 2395 ("*As long as it is acting within the powers granted to it by the Constitution,* Congress may impose its will on the States [under the Supremacy Clause].") (emphasis added).

As discussed in Part III, *supra,* the enumerated power under which Congress acted when it created the Medicaid statute is the Spending Power. Congress has no power to compel the States to participate in voluntary federal programs like Medicaid. If a State chooses to participate in the program, it certainly must comply with program requirements in order to continue to receive the allotted federal funds, "[b]ut the authority to require compliance with participation standards is derived not from the primacy of federal law enacted pursuant to an enumerated power but from the terms of a contract and the agreement to abide by those terms in return for the receipt of federal moneys." *Brogdon v. National Healthcare Corp.,* 103 F.Supp.2d 1322, 1339 (N.D.Ga.2000) (citing *Pennhurst I,* 451 U.S. at 17, 101 S.Ct. 1531).

---

**10.** The Clause itself states:
This Constitution, and the Laws of the United States which shall be made in Pursuance thereof … shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary, notwithstanding.
U.S. Const., Art. VI.

The Supremacy Clause does not operate upon a State or its officers when Congress enacts a program such as Medicaid pursuant to the Spending Power because neither the Spending Power nor any other Article I power grants Congress the authority to compel State action. The relationship between the Federal and State governments in Spending Power programs is merely one of mutual acquiescence. That Congress may (either directly or through delegation to the HHS Secretary) pass Medicaid laws that are inconsistent with state laws pertaining to the same subject does not render those state statutes void; the Federal government must rely on its power of the purse to seek State compliance with Federal program objectives. *See, e.g., Brogdon*, 103 F.Supp.2d at 1339 (noting that congressional enactments under the Spending Power do not preempt State law) (citing *United States v. Morrison*, 529 U.S. 598, 120 S.Ct. 1740, 1754, 146 L.Ed.2d 658 (2000)).

Spending Power enactments do not constitute the "supreme authority of the United States," a point made clear by the Court's holdings in *Alden, Printz, New York, South Dakota,* and *Pennhurst I.* By way of example, if Michigan chose not to participate in the Medicaid program, but instead ran a similar program using its own funds under its own guidelines, Michigan's guidelines would not be preempted by the competing federal Medicaid program, because a State's participation in Medicaid is entirely volitional. The situation is identical here because the Constitution grants the Federal Government no power of compulsion under the Spending Clause; Michigan and the Federal government are on equal constitutional footing, and neither has any power to compel the other. The Court has adopted the view espoused by Chief Justice Burger in *Townsend,* which is that Spending Power enactments are "in no way mandatory upon the States under the Supremacy Clause;" States may either comply with the federal requirements, or forego the benefit of the bargain. *Townsend,* 404

U.S. at 292, 92 S.Ct. 502 (Burger, C.J., concurring) (internal citation omitted). For this court to hold otherwise would be to do that which Hamilton warned against in Federalist 33, namely, to invade Michigan's residual authority by enforcing as the supreme law of the land federal legislation that the Constitution does not make supreme. Because congressional enactments pursuant to the Spending Power that set forth the terms of federal-state cooperative agreements depend on the voluntary agreement of participating States and are not within the ambit of the Supremacy Clause, they are not the supreme law of the land, and suits cannot be brought against state officials under *Ex parte Young* to enforce those requirements.

## B. The State is the Real Party in Interest When Its Officers Act Within Their Lawful Authority.

By virtue of the *Young* doctrine, sovereign immunity does not bar all suits against state officers. However, "[s]ome suits against state officers are barred by the rule that sovereign immunity is not limited to suits which name the State as a party if the suits are, in fact, against the State." *Alden,* 119 S.Ct. at 2267 (citing *In re Ayers,* 123 U.S. 443, 505–06, 8 S.Ct. 164, 31 L.Ed. 216 (1887); *Idaho,* 521 U.S. at 270, 117 S.Ct. 2028 (explaining that "[t]he real interests served by the Eleventh Amendment are not to be sacrificed to elementary mechanics of captions and pleadings.")). Construing *Young* as permitting suit against state officials for all alleged State violations of federal law would render the doctrine of sovereign immunity meaningless. *See Idaho,* 521 U.S. at 269, 117 S.Ct. 2028. As the *Idaho* Court observed:

When suit is commenced. against state officials, even if they are named and served as individuals, the State itself will have a continuing interest in the litigation whenever state policies or procedures are at stake. This commonsense

observation of the State's real interest when its officers are named as individuals has not escaped notice or comment from the Court, either before or after *Young. See, e.g., Osborn v. Bank of United States,* 9 Wheat. 738, 846–47, 6 L.Ed. 204 (1824) (stating that the State's interest in the suit was so "direct" that "perhaps no decree ought to have been announced in the cause, until the State was before the court") (Marshall, C.J.); *Pennhurst II,* 465 U.S. at 114 n. 25, 104 S.Ct. 900 (noting that *Young* rests on a fictional distinction between the official and the State)[.] ... Indeed, the suit in *Young,* which sought to enjoin the state attorney general from enforcing state law, implicated substantial state interests. 209 U.S. at 174, 28 S.Ct. 441 ("[T]he manifest, indeed the avowed and admitted, object of seeking [the requested] relief [is] to tie the hands of the State") (Harlan, J., dissenting). We agree with those observations.

To interpret *Young* to permit a federal-court action to proceed in every case where prospective declaratory and injunctive relief is sought against an officer, named in his individual capacity, would be to undermine the principle, reaffirmed just last Term in *Seminole Tribe,* that Eleventh Amendment immunity represents a real limitation on a federal court's federal question jurisdiction.... Application of the *Young* exception must reflect a proper understanding of its role in our federal system and respect for state courts instead of a reflexive reliance on an obvious fiction. *See, e.g. Pennhurst II, supra,* at 102–03, 114 n. 25, 104 S.Ct. 900 (explaining that the limitation in *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), of *Young* to prospective injunctive relief represented a refusal to apply the fiction in every conceivable circumstance).

*Idaho,* 521 U.S. at 269–270, 117 S.Ct. 2028.

The instant plaintiffs correctly note that *Ex parte Young* suits have been brought repeatedly over at least the past thirty years against state officers for alleged non-compliance with federal-state programs enacted pursuant to the Spending Power. Indeed, the Court's opinion in *Young* permitting some kinds of suits against state officials relied extensively upon its prior opinion in *In re Ayers,* which extensively discussed the circumstances under which state officers could or could not be sued. *See, generally, Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (citing *Ayers,* 123 U.S. 443, 8 S.Ct. 164, 31 L.Ed. 216).

Rather than merely paraphrasing the Court's analysis in *Ayers* to discuss the suitability of such suits, the court believes it more beneficial to quote directly, though at some length, the *Ayers* decision. First:

> It must be regarded as the settled doctrine of this court, established by its recent decisions, "that the question whether a suit is within the prohibition of the Eleventh Amendment is not always determined by reference to the nominal parties on the record." *Poindexter v. Greenhow,* 114 U.S. 270, 287, 5 S.Ct. 903, 29 L.Ed. 185 (1885).

*Ayers,* 123 U.S. at 487, 8 S.Ct. 164. Noting at the outset that this assertion appeared to be in disharmony with Chief Justice Marshall's opinion in *Osborn v. Bank,* 9 Wheat. 738, 857, 6 L.Ed. 204 (1824), in which the Chief Justice wrote that the party named in the pleadings was controlling for purposes of sovereign immunity analysis, the *Ayers* Court quoted Marshall's opinion further, which stated that:

> "The state not being a party on the record, and the court having jurisdiction over those who are parties on the record, the true question is not one of jurisdiction, but whether, in the exercise of its jurisdiction, the court ought to make a decree against the defendants,— whether they are to be considered as having a real interest, or as being only nominal parties."

*Ayers,* 123 U.S. at 488, 8 S.Ct. 164 (quoting *Osborn,* 9 Wheat. at 858, 6 L.Ed. 204). In light of Chief Justice Marshall's caveat, the *Ayers* Court held *Osborn* to mean that:

> [w]here the defendants, who are sued as officers of the state, have not a real, but merely a nominal, interest in the controversy, the state appearing to be the real defendant, and therefore an indispensable party, if the jurisdiction does not fail for want of power over the parties, it does fail as to the nominal defendants, for want of a suitable subject-matter.

*Ayers,* 123 U.S. at 488, 8 S.Ct. 164. Writing for the Court in *Governor of Georgia v. Madrazo,* 1 Pet. 110, 7 L.Ed. 73 (1828), a post-*Osborn* case, Chief Justice Marshall appeared to adopt the interpretation *Ayers* was to later make of his *Osborn* opinion. Relying on *Osborn,* the *Madrazo* Court held that:

> "[w]here the chief magistrate of a state is sued, not by his name, but by his style of office, and the claim made upon him is entirely in his official character, we think the state itself may be considered a party on the record. If the state is not a party, there is no party against whom a decree can be brought. No person in his natural capacity is brought before the court as defendant."

*Ayers,* 123 U.S. at 489, 8 S.Ct. 164 (quoting *Madrazo,* 1 Pet. at 123–24, 7 L.Ed. 73). The *Ayers* Court continued its analysis:

> It was therefore held, [in *Madrazo*], that the state was in fact, though not in form, a party defendant to the suit, and that, consequently, the circuit court had no jurisdiction to pronounce the decree appealed from[:] ... Accordingly, in *Cunningham v. Railway Co.,* 109 U.S. 446, 3 S.Ct. 292, 27 L.Ed. 992 (1883), it was decided that in those cases where it is clearly seen upon the record that the state is an indispensable party to enable the court, according to the rules which govern its procedure, to grant the relief sought, it will refuse to take jurisdiction. The inference is that where it is manifest, upon the face of the record, that

the defendants have no individual interest in the controversy, and that the relief sought against them is only in their official capacity as representatives of the state, which alone is to be affected by the judgment or decree, the question then arising, whether the suit is not substantially a suit against the state, is one of jurisdiction.

*Ayers,* 123 U.S. at 489, 8 S.Ct. 164. The *Ayers* Court went on to analyze the import of its post-*Madrazo* decision in *Hagood v. Southern,* 117 U.S. 52, 6 S.Ct. 608, 29 L.Ed. 805 (1886):

> [In *Hagood,*] the state of South Carolina, which was the party in interest, was not nominally a defendant. The nominal defendants were the treasurer of the state of South Carolina, its comptroller general, and the treasurers of its various counties and their successors in office. The object of the bills was to obtain on behalf of the complainants, by judicial process, the redemption by the state of certain scrip of which they were holders, according to the terms of a statute in pursuance of which it was issued, by the levy, collection, and appropriation of a special tax pledged to that purpose, as they claimed, by an irrepealable law constituting a contract protected from violation by the Constitution of the United States. The decrees of the circuit court granting the relief were·reversed, and the case remanded, with instructions to dismiss the bills, on the ground that the suits, though nominally against the officers of the state, were really against the state itself. In its opinion this court said, "These suits are accurately described as bills for the specific performance of a contract between the complainants and the state of South Carolina, who are the only parties to it. But to these bills the state is not in name made a party defendant, though leave is given to it to become such if it chooses; and except with that consent it could not be brought before the court, and be made to appear and defend.

And yet it is the actual party to the alleged contract, the performance of which is decreed, the one required to perform the decree, and the only party by whom it can be performed. Though not nominally a party to the record, it is the real and only party in interest, the nominal defendants being the officers and agents of the state, having no personal interest in the subject matter of the suit, and defending only as representing the state. And the things required by the decrees to be done and performed by them are the very things which, when done and performed, constitute a performance of the alleged contract by the state. The state is not only the real party to the controversy, but the real party against which relief is sought by the suit, and the suit is therefore substantially within the prohibition of the Eleventh Amendment to the Constitution of the United States." *Hagood,* 117 U.S. at 67, 6 S.Ct. 608.

The conclusions in the case of *Hagood v. Southern* were justified by what had previously been decided by this court in the cases of *Louisiana v. Jumel* and *Elliott v. Wiltz,* 107 U.S. 711, 2 S.Ct. 128, 27 L.Ed. 448 (1882)[ (which were decided in one opinion) ]. Those cases had for their object, one, by injunction, to restrain the officers of the state from executing the provisions of the act of the general assembly alleged to be in violation of the contract rights of the plaintiffs, and the other, by mandamus, to require the appropriation of money from the treasury of the state in accordance with the contract. This relief, it was decided, was not within the competency of the judicial power. The Chief Justice said, on that point, "The remedy sought, in order to be complete, would require the court to assume all of the executive authority of the state, so far as it was related to the enforcement of this law, and to supervise the conduct of all persons charged with any official duty in respect to the levy, collection, and disbursement of the tax in question until

the bonds, principal and interest, were paid in full; and that, too, in a proceeding in which the state, as a state, was not and could not be made a party. It needs no argument to show that the political power cannot be thus ousted of its jurisdiction, and the judiciary set in its place. When a state submits itself, without reservation, to the jurisdiction of the court in a particular case, that jurisdiction may be used to give full effect to what the state has, by its act of submission, allowed to be done; and if the law permits the coercion of the public officers to enforce any judgment that may be rendered, then such coercion may be employed for that purpose. But this is very far from authorizing the court, when a state cannot be sued, to set up its jurisdiction over the officers in charge of the public moneys, so as to control them as against the political power, in their administration of the finances of the state." *Louisiana,* 107 U.S. at 727, 2 S.Ct. 128.

*Ayers,* 123 U.S. at 490–92, 8 S.Ct. 164. In short, the *Ayers* Court held that plaintiffs could not circumvent a State's sovereign immunity from suit by naming as defendants the officers charged with carrying out the State's alleged delinquent responsibilities. Elaborating further, and using the analysis later relied upon in *Ex Parte Young,* the Court delineated the circumstances under which state officers might be sued:

[The *Ayers* plaintiffs who are suing Virginia officers for the state's alleged contractual breach do not] allege any grounds of equitable relief against the individual defendants for any personal wrong committed or threatened by them. It does not charge against them in their individual character anything done or threatened which constitutes, in contemplation of law, a violation of personal or property rights, or a breach of contract to which they are parties. The relief sought is against the defendants, not in their individual but in their repre-

sentative capacity, as officers of the state of Virginia. The acts sought to be restrained are the bringing of suits by the state of Virginia in its own name, and for its own use. If the state had been made a defendant to this bill by name, charged according to the allegations it now contains,—supposing that such a suit could be maintained,—it would have been subjected to the jurisdiction of the court by process served upon its governor and attorney general, according to the precedents in such cases. If a decree could have been rendered enjoining the state from bringing suits against its taxpayers, it would have operated upon the state only through the officers who by law were required to represent it in bringing such suits, viz., the present defendants, its attorney general, and the commonwealth's attorneys for the several counties. For a breach of such an injunction, these officers would be amenable to the court as proceeding in contempt of its authority, and would be liable to punishment therefor by attachment and imprisonment.

The nature of the case, as supposed, is identical with that of the case as actually presented in the bill with the single exception that the state is not named as a defendant. How else can the state be forbidden by judicial process to bring actions in its name, except by constraining the conduct of its officers, its attorneys, and its agents? And if all such officers, attorneys, and agents are personally subjected to the process of the court, so as to forbid their acting in its behalf, how can it be said that the state itself is not subjected to the jurisdiction of the court as an actual and real defendant?

It is, however, insisted upon in argument that it is within the jurisdiction of the circuit court of the United States to restrain by injunction officers of the states from executing the provisions of state statutes void by reason of repugnancy to the Constitution of the United States; that there are many precedents

in which that jurisdiction has been exercised under the sanction of this court; and that the present case is covered by their authority.

*Ayers*, 123 U.S. at 497–98, 8 S.Ct. 164 (internal citations omitted). But the precedents referred to, in which the Court permitted state officers to be sued were:

[a]djudged not to be a suit against the state, and not to be one in which the state was a necessary party, [and the rationale permitting suit] was that the defendants personally and individually were wrong-doers, against whom the complainants had a clear right of action for the recovery of the property taken, or its value, and that, therefore, it was a case in which no other parties were necessary. The right asserted and the relief asked were against the defendants as individuals. They sought to protect themselves against personal liability by their official character as representatives of the state. This they were not permitted to do, because the authority under which they professed to act was void.

. . . . .

■ The vital principle in all such cases is that the defendants, though professing to act as officers of the state, are threatening a violation of the personal or property rights of the complainant, for which they are personally and individually liable[.] . . . "A defendant sued as a wrong-doer, who seeks to substitute the state in his place, or to justify by the authority of the state, or to defend on the ground that the state has adopted his act and exonerated him, cannot rest on the bare assertion of his defense. He is bound to establish it. The state is a political corporate body, can only act through its agents, and can command only by laws. It is necessary, therefore, for such a defendant, in order to complete his defense, to produce a law of the state which constitutes his commission as its agent and a warrant for his act[.]"

... The legislation under which the defendant justified, being declared to be null and void, as contrary to the Constitution of the United States, therefore left him defenseless, subject to answer to the consequences of his personal act .. [.]

*Ayers,* 123 U.S. at 500–01, 8 S.Ct. 164 quoting *Poindexter v. Greenhow,* 114 U.S. at 288, 5 S.Ct. 903. A state officer can claim to be acting as the agent of the State only where such authority has been conferred by law. *See Ayers,* 123 U.S. at 501, 8 S.Ct. 164 (citing *United States v. Lee,* 106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171 (1882)). The *Ayers* Court went on to explain that the question of whether a state officer possesses lawful authority is a feature that:

> [w]ill be found, on an examination, to characterize every case where persons have been made defendants for acts done or threatened by them as officers of the government, either of a state or of the United States, where the objection has been interposed that the state was the real defendant, and has been overruled. The action has been sustained only in those instances where the act complained of, considered apart from the official authority alleged as its justification, and as the personal act of the individual defendant, constituted a violation of right for which the plaintiff was entitled to a remedy at law or in equity against the wrong-doer in his individual character.

*Ayers,* 123 U.S. at 501–02, 8 S.Ct. 164. Utilizing the analysis to later be relied upon in *Young,* the Court explicated the circumstances under which Eleventh Amendment sovereign immunity poses no bar to suits against state officers acting under color of authority for violations of federal rights:

> The government of the United States, in the enforcement of its laws, deals with all persons within its territorial jurisdiction as individuals owing obedience to its authority. The penalties of disobedience may be visited upon them without regard to the character in which they assume to act, or the nature of the exemption they may plead in justification. Nothing can be interposed between the individual and the obligation he owes to the Constitution and laws of the United States, which can shield or defend him from their just authority, and the extent and limits of that authority the government of the United States, by means of its judicial power, interprets and applies for itself. If therefore, an individual, acting under the assumed authority of a state, as one of its officers, and under color of its laws, comes into conflict with the superior authority of a valid law of the United States, he is stripped of his representative character, and subjected in his person to the consequences of his individual conduct. The state has no power to impart to him any immunity from responsibility to the supreme authority of the United States.

*Ayers,* 123 U.S. at 507, 8 S.Ct. 164.

Reiterating its analyses under the facts presented by *Ayers, see id.* at 502–04, 8 S.Ct. 164, the Court came to the identical conclusion found in the precedents it relied upon:

> [W]here the contract is between the individual and the state, no action will lie against the state, and any action founded upon it against defendants who are officers of the state, the object of which is to enforce its specific performance by compelling those things to be done by the defendants which, when done, would constitute a performance by the state, or forbid the doing of those things which, if done, would merely be breaches of the contract of the state, is in substance a suit against the state itself, and equally within the prohibition of the Constitution.
>
> It cannot be doubted that the Eleventh Amendment to the Constitution operates to create an important distinction between contracts of a state with individuals and contracts between individual

parties[.] ... [B]y virtue of the Eleventh Amendment to the Constitution, there being no remedy by a suit against the state, the contract is substantially without sanction, except that which arises out of the honor and good faith of the state itself, and these are not subject to coercion. Although the state may, at the inception of the contract, have consented as one of its conditions to subject itself to suit, it may subsequently withdraw that consent, and resume its original immunity, without any violation of the obligation of its contract in the constitutional sense. The very object and purpose of the Eleventh Amendment were to prevent the indignity of subjecting a state to the coercive process of judicial tribunals at the instance of private parties. It was thought to be neither becoming nor convenient that the several states of the Union, invested with that large residuum of sovereignty which had not been delegated to the United States, should be summoned as defendants to answer to complaints of private persons ... or that the course of their public policy and the administration of their public affairs should be subject to and controlled by the mandates of judicial tribunals, without their consent, and in favor of individual interests. To secure the manifest purposes of the constitutional exemption guaranteed by the Eleventh Amendment; requires that it should be interpreted, not literally and too narrowly, but fairly, and with such breadth and largeness as effectually to accomplish the substance of its purpose. In this spirit it must be held to cover, not only suits brought against a state by name, but those also brought against its officers, agents, and representatives, where the state, though not named as such, is, nevertheless, the only real party against which alone in fact the relief is asked, and against which the judgment or decree effectively operates.

*Ayers,* 123 U.S. at 504–06, 8 S.Ct. 164 (internal citations omitted).

It bears repeating that the *Ayers* decision is the basis of the Court's holding in *Ex parte Young,* and that *Ayers* has been recently reaffirmed in *Idaho* and *Alden.* The applicability of state sovereign immunity to state officers, and the corresponding narrowness of the *Young* exception were also more recently discussed at length in the Court's *Pennhurst II* decision. *See* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). In that case, a class action complaint was brought in federal court seeking injunctive relief against state officers responsible for operating an institution for mentally retarded patients, allegedly in a manner violative of federal and state law. *Id.* Returning to the familiar principals enunciated in *Ayers,* the Court stated that, "It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment," and that "[t]his jurisdictional bar applies regardless of the nature of the relief requested." *Id.,* at 100, 104 S.Ct. 900 (internal citations omitted).

And, as it had in *Ayers,* the Court held once again that:

The Eleventh Amendment bars a suit against state officials when "the state is the real, substantial party in interest." *Ford Motor Co. v. Department of Treasury,* 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945). *See, e.g., In re Ayers,* 123 U.S. 443, 487–92, 8 S.Ct. 164, 31 L.Ed. 216 (1887); *Louisiana v. Jumel,* 107 U.S. 711, 720–723, 2 S.Ct. 128, 27 L.Ed. 448 (1883). Thus, "[t]he general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter." *Hawaii v. Gordon,* 373 U.S. 57, 58, 83 S.Ct. 1052, 10 L.Ed.2d 191 (1963) (*per curiam*). And, as when the State itself is named as the defendant, a suit against state officials that is in fact a suit against a State is barred regardless of whether it seeks

damages or injunctive relief. *See Cory v. White*, 457 U.S. 85, 91, 102 S.Ct. 2325, 72 L.Ed.2d 694 (1982).

*Pennhurst II*, 465 U.S. at 101–02, 104 S.Ct. 900.

As noted in Part IV.A., *supra*, the Medicaid statutes at issue in this litigation do not involve supreme federal law. In *Pennhurst II*, by contrast, the Court forbade federal courts from enjoining state officers purportedly acting in contravention of state law. Though the Court observed that it was not reaching the specific question of whether federal courts had jurisdiction to grant prospective relief on the basis of federal law (and without reference as to whether such federal law was "supreme"), it did note that "the scope of any such relief would be constrained by principles of comity and federalism." *Id.* at 104 n. 13, 104 S.Ct. 900 (citing *Rizzo v. Goode*, 423 U.S. 362, 378, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) (quoting *Stefanelli v. Minard*, 342 U.S. 117, 120, 72 S.Ct. 118, 96 L.Ed. 138 (1951))("Where, as here, the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the 'special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.' ")). The Court then went on to discuss at length the circumstances in which a suit against a state officer was in reality a suit against the sovereign State, and the limited circumstances under which suit against such officials might be brought under *Young:*

> The general rule is that a suit is against the sovereign if "the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration," or if the effect of the judgment would be "to restrain the Government from acting, or to compel it to act." *Dugan v. Rank*, 372 U.S. 609, 620, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963) (citations omitted).

*Pennhurst II*, 465 U.S. at 101 n. 11, 104 S.Ct. 900.

The *Pennhurst II* Court noted that in *Belknap v. Schild*, 161 U.S. 10, 16 S.Ct. 443, 40 L.Ed. 599 (1896), it had drawn a careful distinction between actions in tort against a state officer as an individual and "suits in which the relief would run more directly against the State." *Pennhurst II*, 465 U.S. at 111 n. 21, 104 S.Ct. 900 (citing *Belknap*, 161 U.S. at 18, 16 S.Ct. 443). That distinction was reiterated yet again in *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949), where the Court "plainly and explicitly rejected"

> the argument that an allegation that a government official committed a tort sufficed to distinguish the official from the sovereign. Therefore, the argument went, a suit for an injunction to remedy the injury would not be against the sovereign. The Court rejected the argument, noting that it would make the doctrine of sovereign immunity superfluous. A plaintiff would need only to "claim an invasion of his legal rights" in order to override sovereign immunity. *Larson*, 337 U.S. at 693, 69 S.Ct. 1457. In the Court's view, the argument "confuse[d] the doctrine of sovereign immunity with the requirement that a plaintiff state a cause of action." *Id.* at 692–93, 69 S.Ct. 1457.

*Pennhurst II*, 465 U.S. at 112, 104 S.Ct. 900. Under that rejected theory, "a plaintiff would need only claim a denial of rights protected or provided by statute in order to override sovereign immunity," thereby rendering it a virtual nullity. *Id.* *Larson* established that the test of whether sovereign immunity is overridden under *Young* "turns on whether the defendant state official was empowered to do what he did, i.e., whether, even if he acted erroneously, it was action within the scope of his authority." *Id.* at 111–13 n. 22, 104 S.Ct. 900, (citing *Larson*, 337 U.S. at 685, 69 S.Ct. 1457). The *Larson* Court explicitly rejected the theory that "an officer given the power to make decisions is only given the power to make correct decisions." *Id.* (citing *Larson*, 337 U.S. at 695, 69 S.Ct.

1457). "The Court in *Larson* made crystal clear that an officer might make errors and still be acting within the scope of his authority." *Id.* As summarized by the *Pennhurst II* Court:

> *Larson* thus made clear that, at least insofar as injunctive relief is sought, an error of law by state officers acting in their official capacities will not suffice to override the sovereign immunity of the State where the relief effectively is against it. *Larson,* 337 U.S. at 690, 695, 69 S.Ct. 1457. Any resulting disadvantage to the plaintiff was "outweigh[ed] by 'the necessity of permitting the Government to carry out its functions unhampered by direct judicial intervention.'" *Id.* at 704, 69 S.Ct. 1457. If anything, this public need is even greater when questions of federalism are involved.

*Pennhurst II,* 465 U.S. at 113–114, 104 S.Ct. 900.

The instant plaintiffs posit that their complaint poses no question of a waiver or abrogation of Michigan's sovereign immunity because they seek only prospective injunctive relief against Messrs. Haveman and Smedes, not the State itself. Having sued only these individuals, plaintiffs argue, *Ex parte Young* negates any sovereign immunity issue that would undoubtedly be implicated if they had sued Michigan directly. But plaintiffs' description of the *Young* doctrine drastically oversimplifies what it permits and conflicts with Supreme Court precedents, both ancient and modern.

According to the doctrine recently reaffirmed by the Supreme Court in *Idaho,* to accept plaintiff's position here that *Young* permits all suits against state officers as proxies of their employing State would render sovereign immunity meaningless. *Young* permits a federal suit against a state officer only where the state law under which he purports to be acting is in conflict with federal law, under the legal fiction that he is thereby "stripped of his representative character." Because the

officer cannot exercise void legal authority on the State's behalf, he is acting solely in his capacity as an individual, and can be held personally liable for his wrongdoing.

Here, the opposite is true. Messrs. Haveman and Smedes are not named as defendants because they have acted beyond their lawful authority as state officers, or because the Michigan statutes granting them authority are void in the face of superceding federal law. Plaintiffs do not claim these two individuals acted without lawful authority; in fact, plaintiffs have sued them precisely because they do have the alleged lawful authority to accomplish the relief plaintiffs seek. There is no personal, unlawful behavior attributed to these two men that plaintiffs wish to enjoin. They are sued solely in their capacities as representatives of the State of Michigan. It is Michigan, not Haveman and Smedes who are parties to the Medicaid agreement with the federal government. It is Michigan's treasury, not the officers' pocketbooks, which will pay for the EPSDT programs plaintiffs seek. It is Michigan that would bear the burden of administering this program under any order issued by this court, regardless of whether Haveman and Smedes are the individuals charged with implementing the State's obligations. Michigan is the only real party against whom plaintiffs seek relief in this suit; the naming of the officers as defendants is an empty formality. In substance, plaintiffs assert that the State has not met its purported responsibilities, and that this court should commandeer the executive authority of the State, take charge of its officers, and appropriate from its treasury in order to provide the level of Medicaid services argued for by plaintiffs. Supreme Court jurisprudence from Chief Justice Marshall's time to the present makes it plain that federal courts lack such authority.

In arguing to the contrary, plaintiffs rely on the "holding" in *Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979) for the proposition that "a federal

court, consistent with the Eleventh Amendment, may enjoin state officials to conform their future conduct to the requirements of federal law, even though such an injunction may have an ancillary effect on the state treasury." *Id.* at 337, 99 S.Ct. 1139. But this "holding" attributed to *Quern* is not the case holding at all, but is instead a summary of a discussion from the previous iteration of the same case, *Edelman v. Jordan,* 415 U.S. 651, 667–68, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). The cited *Edelman* discussion was, in turn, a brief listing of several cases in which *Ex parte Young* had been found to apply, followed by the obvious observation that even prospective injunctive relief against state officers can have an effect on a State's treasury (such as in *Ex parte Young* itself, where the State lost revenue by dint of its officers being precluded from levying penalties in violation of the due process clause). *Id. Edelman* contains no discussion of when state officers will be deemed to act in the shoes of the State for sovereign immunity purposes, except for a cautionary note (directly preceding the passage upon which plaintiffs vicariously cite through *Quern* ) that *Ex parte Young* and its progeny do not permit all forms of prospective injunctive relief against state officers, and that *Young*'s reliance upon *Hagood* and *Ayers* for the proposition that the federal courts cannot compel state officers to enforce State contracts was still good law. *Edelman,* 415 U.S. at 666–67, 94 S.Ct. 1347 (citing *Hagood,* 117 U.S. 52, 6 S.Ct. 608 and *Ayers,* 123 U.S. 443, 8 S.Ct. 164, 31 L.Ed. 216). Indeed, the Supreme Court has explicitly disclaimed having decided a jurisdictional issue in *Edelman. See Hagans v. Lavine,* 415 U.S. 528, 533 n. 5, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). Hence, even *Edelman* serves as a reminder that *Ex parte Young* is not a *carte blanche* authorization for prospective equitable relief against individual state officers.

*Quern* instead stands for the relatively innocuous proposition that a federal court has the authority to order a defendant State to provide opposing litigants with notice of the "prospective relief already ordered by the court," 440 U.S. at 349, 99 S.Ct. 1139, and that such notice is purely "ancillary," *id.,* because "the mere sending of that notice does not trigger the state administrative machinery." *Id.* at 348, 99 S.Ct. 1139. The Court found it significant that:

> Whether a recipient of notice [ordered by a court against a defendant state] decides to take advantage of those available state procedures [to obtain the benefits plaintiffs claimed were unlawfully denied them] is left completely to the discretion of that particular class member; the federal court plays no role in that decision. And whether or not the class member will receive retroactive benefits rests entirely with the State, its agencies, courts, and legislature, not with the federal court.

*Id.* Notwithstanding plaintiffs' reliance on it here, *Quern* is a decision describing the limits of a federal court's power to authorize relief against a State, and approving of it in that case precisely because it was not substantive relief, and as such would have no effect on the State's sovereign ability to manage its own program.

The foregoing analysis of the limits of the holdings in *Quern* and *Edelman*'s was confirmed in *Pennhurst II,* when the majority opinion addressed the dissent's theory of the prospective equitable relief available against state officers, which is identical to that proposed by plaintiffs here:

> In *Edelman,* although the State officers were alleged to be acting contrary to law, and therefore should have been "stripped of their authority" under the theory of the dissent, we held the action to be barred by the Eleventh Amendment. The dissent attempts to distinguish *Edelman* on the ground that the retroactive relief there, unlike injunctive relief, does not run against the agent. To say that injunctive relief against

State officials acting in their official capacity does not run against the State is to resort to the fictions that characterize the dissent's theories. Unlike the English sovereign perhaps, an American State can act only through its officials. It is true that the Court in *Edelman* recognized that retroactive relief often, or at least sometimes, has a greater impact on the State treasury than does injunctive relief, but there was no suggestion that damages alone were thought to run against the State while injunctive relief did not. We have noted that the authority-stripping theory of *Young* is a fiction that has been narrowly construed.... The [*ultra vires*] doctrine excepts from the Eleventh Amendment bar suits against officers acting in their official capacities but without any statutory authority, even though the relief would operate against the State. At bottom, the doctrine is based on the fiction of the *Young* opinion. The dissent's method is merely to take this fiction extreme. While the dissent's result may be logical, in the sense that it would be difficult to draw principled lines short of that end, its view would virtually eliminate the constitutional doctrine of sovereign immunity.... For present purposes, however, we do no more than question the continued vitality of the *ultra vires* doctrine in the Eleventh Amendment context. We hold only that to the extent the doctrine is consistent with the analysis of this opinion, it is a very narrow exception that will allow suit only under the standards set forth in n.11, *supra.*

*Pennhurst II*, 465 U.S. at 114 n. 25, 104 S.Ct. 900 (internal citations omitted); *See also Green v. Mansour*, 474 U.S. 64, 70–71, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985) (confirming that notice in *Quern* was not an independent form of relief, and was merely a "case-management device").

In note 11, as previously set forth in this opinion, *supra,* the *Pennhurst II* Court held that:

The general rule is that a suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting or compel it to act... [A] state officer may be said to act *ultra vires* only when he acts without any authority whatever... [A]n *ultra vires* claim rests on the officer's lack of delegated power. A claim of error in the exercise of that power is therefore not sufficient.

*Id.* at 102 n. 11, 104 S.Ct. 900 (internal citations and quotations omitted).

The Court then further noted that the defendant state officers in *Pennhurst II*, who were responsible for operating the mental health institutions whose care was alleged to be inadequate, plainly were not acting beyond the authority delegated by the State to operate the institution. *Id.* In other words, they were acting lawfully as agents of the State, even though their exercise of the State's authority was purportedly substandard. Put simply, they were acting *intra vires*. That an agent may be doing a poor job of exercising his agency does not make him less of an agent. It is only when he acts beyond the authority delegated to him that he acts *ultra vires*. Cf. *Wisconsin Bell v. Public Service Comm'n of Wisconsin*, 57 F.Supp.2d 710, 713 (W.D.Wis.1999) (explaining that "one must acknowledge the conceptual difference between a state official performing state functions in a way that violates federal law and a state official who is performing federally authorized functions but is alleged to be performing those functions improperly"); *accord Children's Healthcare is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1416–18 (6th Cir. 1996) (describing *Young* as a limited exception to Eleventh Amendment immunity that is inapplicable where no unconstitutional actions by state officers are alleged).

It is on this point—that it is really the State that is being sued—that plaintiffs

present one of their strongest arguments, in which they describe Michigan's assertion of sovereign immunity to suit as a "red herring" because the Sixth Circuit and this court have held on numerous occasions that the Eleventh Amendment does not bar suits for prospective injunctive relief against state officers, even when those officers are being sued in their official capacity and the relief will actually run against the State. *See Nelson v. Miller,* 170 F.3d 641, 645 (6th Cir.1999); *Futernick v. Sumpter Township,* 78 F.3d 1051, 1055 (6th Cir.), *cert. denied sub nom., Futernick v. Caterino,* 519 U.S. 928, 117 S.Ct. 296, 136 L.Ed.2d 215 (1996); *Doe v. Wigginton,* 21 F.3d 733, 736–37 (6th Cir.1994); *Akella v. Mich. Dept. of State Police,* 67 F.Supp.2d 716, 722 (E.D.Mich.1999). In each case, the test utilized for determining whether a suit against a state officer in his official capacity was in fact a suit against the State was whether the relief sought was retrospective or prospective. That criterion is undoubtedly correct. *Ex parte Young* at most offers plaintiffs only prospective relief, and retrospective relief cannot be granted because it will inevitably be at the State's expense. But that is not the only criterion. As the Sixth Circuit observed in *Children's Healthcare,* the availability of the *Young* doctrine depends upon there being an officer who is acting outside his lawful authority, or on the basis of authority assumed in contravention of the federal Constitution. *See Children's Healthcare,* 92 F.3d at 1414–16. Furthermore, in *Alden v. Maine,* a Supreme Court opinion written subsequent to the cases upon which plaintiffs rely, the Court reiterated the *ultra vires-intra vires* distinction under *Ex parte Young,* as well as noting yet again that the *Young* doctrine did not authorize all suits for prospective equitable relief:

. [T]he exception to our sovereign immunity doctrine recognized in *Ex parte Young* is based in part on the premise that sovereign immunity bars relief against States and their officers in both state and federal courts, and that *cer-* *tain suits* for declaratory or injunctive relief against state officers must therefore be permitted if the Constitution is to remain the supreme law of the land. As we explained in *General Oil Co. v. Crain,* 209 U.S. 211, 28 S.Ct. 475, 52 L.Ed. 754 (1908), a case decided the same day as *Ex parte Young* and extending the rule of that case to state-court suits: "It seems to be an obvious consequence that as a State can only perform its functions through its officers, a restraint upon them is a restraint upon its sovereignty from which it is exempt without its consent in the state tribunals, and exempt by the Eleventh Amendment of the Constitution of the United States, in the national tribunals. The error is in the universality of the conclusion, as we have seen. Necessarily to give adequate protection to constitutional rights *a distinction must be made between valid and invalid state laws,* as determining the character of the suit against state officers."

*Alden,* 119 S.Ct. at 2263 (quoting *General Oil,* 209 U.S. at 226–27, 28 S.Ct. 475) (emphasis added) (internal citations omitted). Plaintiffs sole reliance upon a prospective-retrospective test for *Ex parte Young* relief fails not because it is unnecessary, but because it is insufficient.

Messrs. Haveman and Smedes are indisputably the individuals responsible for carrying out the EPSDT services on behalf of Michigan of which plaintiffs complain. However, they are acting in their official capacities within the authority delegated to them by the State, and the relief sought against them is in reality to be inflicted only against the State. Accordingly, the State of Michigan is the real defendant in this suit, and the doctrine of *Ex parte Young* does not apply, even though plaintiffs have nominally named individual state officers as defendants. Unless otherwise waived by the State, Michigan's officers share the State's immunity from private suits so long as they are acting within the lawful authority delegated to them by the

State, and this court has no authority to order the relief sought against them.

## C. The Court Lacks Authority to Compel State Officers Performing Discretionary Functions

Under the doctrine of *Ex parte Young:*

There is no doubt that the [federal] court cannot control the exercise of the discretion of an officer. It can only direct affirmative action where the officer having some duty to perform not involving discretion, but merely ministerial in nature, refuses or neglects to take such action. In that case, the court can direct the defendant to perform this merely ministerial duty.

*Ex parte Young,* 209 U.S. at 158, 28 S.Ct. 441 (internal citation omitted).

Plaintiffs here quote a similar holding from *In re Ayers,* which stated:

[I]t has been well settled that, when a plain official duty, requiring no exercise of discretion, is to be performed, and performance is refused, any person who will sustain personal injury by such refusal may have a mandamus to compel its performance; .. [.]

*In re Ayers,* 123 U.S. at 506, 8 S.Ct. 164 (internal citation omitted).

This court's review of the statutes and regulations upon which plaintiffs' complaint relies as the basis for Messrs. Haveman's and Smedes' purported wrongdoing informs it that their responsibilities "involve the paradigmatic exercise of discretion." *Wisconsin Bell,* 57 F.Supp.2d at 713. That is, even if Michigan were obligated to provide all of the services plaintiffs argue are required (an argument that the State disputes in many facets) the federal laws upon which plaintiffs rely do not explain how those levels of service are to be reached, nor do those federal laws require that the State provide service in a particular manner. Moreover, even if the responsible state officials are obligated to accomplish the purportedly federally-mandated goals, plaintiffs point this court to no statutes or regulations that deny those

decision makers "the character of judgment or discretion" in determining how to get there. *United States ex rel. Girard Trust Co. v. Helvering,* 301 U.S. 540, 543–44, 57 S.Ct. 855, 81 L.Ed. 1272 (1937). Under the laws relied upon by plaintiffs, the lack of official discretion necessary to invoke *Ex parte Young* mandamus-type relief is, at a minimum, far from being "clear." *See, e.g., Heckler v. Ringer,* 466 U.S. 602, 616, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984) (explaining that defendant must owe plaintiff a "clear, nondiscretionary duty" under common law of mandamus). Even though they fail to allege such an obvious nondiscretionary duty, plaintiffs seek the appointment of a Special Master whereby the court can superintend the performance of the Michigan Department of Community Health's management of the EPSDT program. The claimed need for such superintending demonstrates that plaintiffs in actuality seek to have the court to exercise its discretion in place of the State's; were this not the case, it would seem that a simple injunctive order would be sufficient to require the defendants to perform their "nondiscretionary" duties. Nonetheless, plaintiffs' complaint utterly fails to allege that named defendants Haveman and Smedes lack discretion in managing the EPSDT services at issue in this litigation, and that failure precludes this suit from falling within the narrow class of cases eligible for *Ex parte Young* relief.

## D. Where the Statutory Scheme Provides a Remedy, the Court May Not Substitute an Alternative Form of Relief.

In *Seminole Tribe,* the Supreme Court held that:

[W]here Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon *Ex parte Young.*

*Seminole Tribe,* 517 U.S. at 74, 116 S.Ct. 1114; *accord Telespectrum, Inc. v. Public Serv. Comm'n of Kentucky,* 227 F.3d 414, 419–21 (6th Cir.2000) (recognizing *Seminole Tribe*'s limitation of *Ex parte Young* where a statutory remedial scheme already exists).

The *Seminole Tribe* Court recognized that under the statute at issue in that litigation, Congress had already imposed upon states participating in the program at issue a limited form of liability for non-compliance. *Id.* at 75–76, 116 S.Ct. 1114. To permit the full panoply of remedial sanctions available under *Ex parte Young* to be imposed against such States, the Court recognized, would render the more limited sanctions contained in the statute superfluous. *Id.; see also Wisconsin Bell,* 57 F.Supp.2d at 713 (indicating that a statutory provision for judicial review of state commission actions was exclusive remedy, rendering *Ex parte Young* irrelevant). As previously discussed in Part II, *supra,* the Medicaid statute contains a specific, limited remedy that may be used against non-compliant States: The HHS Secretary may withhold funds from those States that she believes are not meeting their contractual responsibilities under the federal-state cooperative agreement.

In *Suter v. Artist M.,* 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), the Court suggested (without so finding) that the provision of a funding cutoff mechanism within a statutory program enacted under the Spending Power might foreclose remedies by private plaintiffs. *Id.* at 360–61, n. 11–12, 112 S.Ct. 1360. The *Suter* Court observed that so long as the federal government maintained the ability to enforce the program requirements at issue with the carrot and stick of federal funds, those requirements could hardly be considered unenforceable. *Id.* at 360–61. *Suter,* however, was decided before *Seminole Tribe,* and in the later case the Court's suggestion in *Suter* came to fruition. Because the Medicaid statute contains a remedial enforcement provision far more limited than that which this court might order under *Ex parte Young* (and certainly more limited that the relief sought be plaintiffs), this court is without authority to defy the congressionally-mandated scheme and impose more extensive remedial measures, even if they might be more efficacious [11] in accomplishing the congressional purpose. The existence of a limited remedy in the Medicaid statute precludes the use of *Ex parte Young* to enforce the statutory scheme by other means.

## V. Whether § 1983 Creates a Private Cause of Action Against Michigan's Officers for Non–Compliance With the Medicaid Program

In addition to arguing that defendants are liable under the *Ex parte Young* doctrine (an argument the court has found unpersuasive) [12] plaintiffs also argue that Michigan has voluntarily waived its sovereign immunity from suit, *see, e.g., College Savings,* 119 S.Ct. at 2223, and that Michigan knowingly accepted the unambiguous condition, *see Pennhurst I,* 451 U.S. at 17, 101 S.Ct. 1531, that it be amenable to private causes of action for non-compliance with the terms of the Medicaid program. As previously explained, it is undisputed that the Medicaid statute itself contains no such condition. But plaintiffs maintain that 42 U.S.C. § 1983, which was enacted well before the EPSDT programs at issue in this litigation, creates a generalized private right of action against States for their non-compliance with federal programs enacted pursuant to the Spending Power. [13] Plaintiffs argue that Michigan knew of this unambiguous condition at the time it

11. A supposition not intended to be implied here.

12. *See, supra,* Part IV.

13. It bears emphasizing that plaintiffs do not argue that every federal-state program enacted pursuant to the Spending Power creates a private cause of action. Whether a private cause of action exists, they posit, depends solely on the construction of the substantive law enacted pursuant to the Spending Clause, which should be construed in conformity with criteria set out by the Supreme Court. If such construction leads to the conclusion that

agreed to accept the federal Medicaid funds, and that this condition has been repeatedly reaffirmed in the years since Medicaid's enactment. As will be discussed below, the court finds plaintiffs' position, while not without support, to be unpersuasive.

■ In pertinent part, § 1983 states that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. The parties here concur that under *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), a State is not a "person" for purposes of § 1983. *Id.* at 64, 109 S.Ct. 2304. Plaintiffs maintain, however, that Messrs. Haveman and Smedes are "persons" amenable to suit under § 1983, and that *Will* supports that understanding.

■ In *Will*, the Court noted that although the scope of the Eleventh Amendment and the scope of § 1983 are separate issues, they are interrelated. *Id.* at 66–67, 109 S.Ct. 2304. For purposes of this litigation, however, it is not entirely clear whether plaintiffs' position is that § 1983 independently operates to waive the sovereign immunity held by state officers acting in their official capacity, or whether such waiver is dependent on the applicability of the *Ex parte Young* doctrine (though it is clear that plaintiffs rely extensively on the doctrine in disputing the State's arguments concerning the state of the law *circa* 1871).[14] But the court's analysis here, however, need not determine the extent to which Michigan's Eleventh Amendment immunity cabins the potential § 1983 liability of its officers. Whether or not § 1983 might be limited by *Ex parte Young* is irrelevant for purposes of this suit, because it is clear under controlling Supreme Court precedent that § 1983 does not create a blanket cause of action for Spending Power programs operated pursuant to voluntary federal-state agreements.

## A. *Will*'s "Clear Statement" and Contemporaneous Construction Requirements for Construing § 1983

In *Will*, the Supreme Court held that:

> [t]he language of § 1983[ ] falls short of satisfying the ordinary rule of statutory construction that if Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute ... Congress should make its intention clear and manifest if it intends to pre-empt the historic powers of the States, or if it intends to impose a condition on the grant of federal moneys. In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision.

*Id.* at 65, 109 S.Ct. 2304 (internal citations and quotations omitted). The *Will* Court held that because a State could not be

---

Congress intended a particular statutory provision to specifically benefit a particular private party, it is plaintiffs' position that § 1983 automatically makes state officers amenable to suit for violations of that statute. As previously alluded to in Footnote 8, *supra*, the court assumes for purposes of this litigation, without so deciding, that the EPSDT provisions at issue are intended to benefit the instant plaintiffs. The court's inquiry here concerns plaintiff's threshold assertion—namely, whether § 1983 does, in fact, operate as a blanket authorization for such suits.

**14.** The lack of clarity on this point is perfectly understandable, given that plaintiffs maintain that their suit is properly brought under *Ex parte Young*, though the court has ultimately determined that it is not.

sued without its consent at the time of § 1983's enactment, the statute had to be construed consistent with the state of the law contemporaneous with its enactment absent an explicit statutory alteration of that understanding. *Id.* at 67, 109 S.Ct. 2304. Specifically, the Court held that:

> [I]n enacting § 1983, Congress did not intend to override well-established immunities or defenses under the common law. One important assumption underlying the Court's decisions in this area is that members of the 42nd Congress were familiar with common-law principles, including defenses previously recognized in ordinary tort litigation, and that they likely intended these common-law principles to obtain, absent specific provisions to the contrary.

*Id.* (internal citations and quotations omitted); *accord Blessing,* 520 U.S. at 350, 117 S.Ct. 1353 (Scalia, J., concurring) ("While it is of course true that newly enacted laws are automatically embraced within § 1983, it does not follow that the question of what rights those new laws (or, for that matter, old laws) secure is to be determined according to modern notions rather than according to the understanding of § 1983 when it was enacted"). As explained in Part III, *supra,* the relationship between Michigan and the Federal Government is a contract. Accordingly, in determining whether § 1983 gives third-party beneficiaries of a federal-state contract the right to sue state officers for contractual breach, this court is required under *Will* to examine whether the law permitted such suits at the time of § 1983's enactment in 1871.

## B. Under the Common Law of 1871 Sovereign Immunity Did Not Permit States to be Sued for Breach of Contract, and the Law of Agency Prohibited Officer–Agents to be Liable for Contractual Breach by State–Principals.

First, as discussed at length in Part IV.B., *supra,* it was clear both before and after the enactment of § 1983 that a private party contract could not be maintained against the States or their officers for breach of contract.[15] Because of considerations of brevity, and because the issue is not in doubt (plaintiffs having offered no authority to the contrary as to this point), this court will limit its recitation to the Supreme Court cases of the period following § 1983's enactment, which repeatedly held that state officers could not be enjoined to perform a State's contractual obligations because they were not parties to the contracts in their personal capacity.

To begin, in *Louisiana v. Jumel,* 107 U.S. 711, 2 S.Ct. 128, 27 L.Ed. 448 (1883), the Court held that the officers and agents of the State could not be ordered to enforce the State's obligations to its bondholders. *Id.* at 721–723, 2 S.Ct. 128 ("They [the state's officers] may be moved through the State, but not the State through them."); *Id.* at 723–24, 2 S.Ct. 128 ("here, the obligation is all on the State, to be discharged through its servants, and the money is held by the officers proceeded against in their character as servants of the State, and no other"). Similarly, in *Hagood v. Southern,* 117 U.S. 52, 6 S.Ct. 608, 29 L.Ed. 805 (1886), the Court dismissed a suit in which the plaintiffs sought specific performance of a contract between the plaintiffs and the State, even though the named defendants were officers of the State, because the officers had no real interest in the suit, as the State was the only real party in interest. *Id.* at 67, 6 S.Ct. 608. And, as discussed earlier in Part IV.B., *supra,* the Court in *Ayers* dismissed a suit to enjoin state officers from taking action that would allegedly breach the State's contract. *Ayers,* 123 U.S. at 497, 503, 8 S.Ct. 164.

In short, there is no doubt that, at the time of § 1983's enactment, agency law did

---

**15.** The briefs of *amicus curiae* MML extensively set forth the state of the law concerning the States' immunity from suit for breaches of their own contracts and the attendant lack of state officer amenability to suit under then-prevailing agency law.

not permit state officers to be sued for the contractual breaches of their employing states. Nor is there any doubt that a suit for a State's contractual breach was barred by sovereign immunity, even where officers were nominally named as defendants, because the State was the real party in interest. Hence, this court is bound by *Will* to interpret the law consistent with those principles. Therefore, Messrs. Haveman and Smedes cannot be sued under § 1983. As agents of the State, they cannot be held liable for Michigan's breach of its Medicaid contract with the federal government. Moreover, their employer, Michigan, as the only real party to the contract alleged to be in breach, is immune from suit.[16]

Plaintiffs argue that the status of agency law in the 1870s is unclear, and that cases exist in which courts enjoined state officers to enforce state contracts. For this proposition, they cite only *Board of Liquidation v. McComb*, 92 U.S. 531, 23 L.Ed. 623 (1875), a case in which a bondholding private citizen successfully brought suit against state officers to enforce a State's obligations under the legislative act issuing the bonds. *Id.* at 532–33. But upon closer examination, *McComb* actually bolsters Michigan's position. This is so because the suit in *McComb* was allowed to proceed precisely because the statute under which the suit was brought expressly authorized a suit against the State if it failed to meet its obligations. *Id.* at 537–38. If the Medicaid statute at issue in this litigation contained such an unambiguous authorization, Michigan and/or its officers could unquestionably be sued. But under the law controlling in 1871, absent such authorization, suits against States for contractual breach were barred, and § 1983 incorporates that prohibition.

Besides their unfounded reliance on *McComb*, plaintiffs' primary argument against this construction of § 1983 is that it has since been superceded by *Ex parte Young*, and that any suits seeking prospective injunctive relief may be brought against state officers acting in their official capacities. Indeed, they have placed great reliance on Footnote Ten of the *Will* opinion, which stated that "[O]f course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because official capacity actions for prospective relief are not treated as actions against the State. This distinction was commonplace in sovereign immunity doctrine and would not have been foreign to the 19th-Century Congress that enacted § 1983." *Will*, 491 U.S. at 71 n. 10, 109 S.Ct. 2304 (internal citations and quotations omitted). As a general matter, plaintiff's endorsement of Footnote Ten is undoubtedly correct. However, use of the Court's generalized recognition fails to take account of the doctrine's limitations, which are contained in *Young, Ayers*, and their progeny, to which Footnote Ten specifically cites. As explained in Parts IV.A. and B., *supra*, plaintiffs' *carte blanche* construction of *Ex parte Young* is completely incongruous with the doctrine's twin requirements that (1) the official be acting *ultra vires*; and (2) that the duty to be performed be non-discretionary in nature. Neither condition exists with respect to Messrs. Haveman and Smedes' execution of the Medicaid statute (nor, for that matter, is there any "supreme" federal law at stake). And for purposes of this analysis, it matters not whether one considers these precepts of a constitutional nature or a mere historical iteration; the fact of the matter is that these strictures were part

---

**16.** Construing § 1983 in accordance with the common law standards as they existed in 1871 is hardly novel, as the Supreme Court has done so on several occasions. *See, e.g., Will*, 491 U.S. 58, 109 S.Ct. 2304 (State not a "person"); *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981) (municipal immunity from puni-

tive damages); *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) (absolute immunity for state judges and "good faith and probable cause" defense for police officers); *Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951) (absolute immunity for state legislators).

and parcel of the common law in 1871, and thus control the statutory construction of § 1983. While plaintiffs are undoubtedly correct that § 1983 has been used countless times since 1871 to obtain prospective injunctive relief against state officials in their official capacities, plaintiffs fail to address the distinction between successful suits brought in tort where the individual's lawless act stripped him of the State's authority, and those unsuccessfully brought in contract where plaintiffs seek relief against individual officers where they still possess the mantle of the State's immunity, and moreover cannot be liable for the misdeeds of their principals. The distinction was crucial in 1871, and § 1983 incorporates it today under the doctrine enunciated in *Will.*

## C. It is not Unambiguously Clear that Third–Party Donee Beneficiaries Could Sue for Breach of Contract in 1871

Section 1983 cannot possibly create a cause of action for third-party donee beneficiaries to a contract, because it is not unambiguously clear that such a right existed at the time the statute was enacted. To their credit, the respective counsels in this case have mustered significant authority on this question of whether a third-party donee beneficiary—*i.e.*, a beneficiary not owed money by the promisee—may sue a party in breach to enforce a contract made for his benefit.[17] It is undisputed that such a right generally exists today; it is greatly disputed whether such a right inhered in 1871.

Not being steeped in the intricacies of 19th Century contract law, this court (and perhaps counsel as well) is consigned to reviewing as best it can the historical sources proffered to it by the litigating factions. At the outset, the court must concede that the issue is not facially clearcut, and that both sides have proffered language from authorities helpful to their respective positions. At a minimum, the number of sources, if not the weight of such authorities, appears to support Michigan's position that third-party donee beneficiaries could not sue the contracting parties in 1871. *See, e.g., Second Nat'l Bank v. Grand Lodge,* 98 U.S. 123, 124–24, 25 L.Ed. 75 (1878) (recognizing "the general rule that privity of contract is required" to support an action to enforce a contract); K. Teeven, *A History of the Anglo–American Common Law of Contract* 230 (1990) (explaining that "the rights of donee beneficiaries were not clearly established until *Seaver v. Ransom* (1918)."); C. Langdell, *A Summary of the Law of Contracts,* 79 (2d ed. 1880) (noting that in the 1870s, the recognized rule was "that a person for whose benefit a promise was made, if not related to the promisee, could not sue upon the promise"); 1 W. Story, *A Treatise on the Law of Contracts* 509 (M. Bigelow ed. 1874) (noting "the tendency of the [American] courts" to hold that "no stranger to the consideration can take advantage of a contract, though made for his benefit"); *accord Blessing,* 520 U.S. at 349–50, 117 S.Ct. 1353 (Scalia, J., concurring) (stating that it "appears to have been the law at the time § 1983 was enacted" that "the third-party beneficiary was generally regarded as a stranger to the contract, and could not sue upon it").

Plaintiffs, however, reject this characterization of the state of contract law *circa*

---

**17.** In their initial brief on this issue, plaintiffs cited numerous 19th Century cases for the proposition that the right of third-party beneficiaries to sue to enforce promises made by others was recognized in the 1870s at the time Congress enacted § 1983. In response, Michigan asserted that the cited cases did not concern donee beneficiaries, but instead involved suits by third-party creditor beneficiaries who were either related to the promisee or had themselves performed services amounting to consideration. Such third-party creditors, Michigan acknowledges, did have the right to sue in 1870, but that was an exception to the general rule prohibiting third-party beneficiaries from bringing suit. Plaintiffs did not challenge Michigan's characterization of those initial citations in their later briefs, and the court's review of plaintiffs' cases confirms the State's analysis of the donee-creditor distinction.

1871, and proffer that the two leading contract law treatise authors, Corbin and Williston, describe donee beneficiaries as having the right to sue promises during that period. Those scholars, and plaintiffs, rely in turn on the case of *Hendrick v. Lindsay*, 93 U.S. 143, 23 L.Ed. 855 (1876). The facts of *Hendrick* can be summarized as follows: Hendrick requested by letter that Lindsay to sign an appeal bond for him. Lindsay agreed to sign the bond, so long as Hendrick agreed to indemnify him if it were collected. Lindsay and Mansfield (apparently an associate of Lindsay's) signed the appeal bond and drafted an indemnity bond that they sent to Hendrick, stating that he would indemnify them if they ultimately had to pay on the appeal bond. Hendrick never signed the indemnity bond. Lindsay and Mansfield ended up having to pay on the appeal bond, and subsequently sued Hendrick for indemnification. The instant parties appear to agree on these factual predicates.

Plaintiffs rely on the following language from *Hendrick* for the proposition that donee beneficiaries could have brought suit in the 1870s:

> It is also argued, as Mansfield's name does not appear in the letters of Hendrick, that he could not join in this action. This would be true, if the promise were under seal, requiring an action of debt or covenant; but the right of a party to maintain assumpsit on a promise not under seal, made to another for his benefit, although much controverted, is now the prevailing rule in this country.

*Hendrick*, 93 U.S. at 149. Plaintiffs note that *Hendrick* nowhere limits the aforequoted language to creditor beneficiaries, and conclude, therefore, that all classes of third-party beneficiaries may sue the contracting parties. In addition, plaintiffs argue that Mansfield could not have been a creditor beneficiary of Lindsay's, because Lindsay would had to have owed Mansfield a duty that Lindsay intended to discharge by rendering performance of the indemnification agreement to Mansfield. Finally, plaintiffs assert that both Corbin and Williston describe Mansfield as a donee beneficiary. *See* Corbin on Contracts (1951) at 334; Williston, *Treatise on the Law of Contracts* § 37:11 at 96 and n.83.

As a textual matter, plaintiffs' interpretation of *Hendrick* does not withstand scrutiny. The unanimous *Hendrick* Court made it clear that it considered Hendrick to be desirous of "procuring a sufficient bond," but that "it was immaterial to Hendrick whether the bond was signed by one or more persons." *Hendrick*, 93 U.S. at 148. Additionally, the Court's analysis of the transaction also makes clear that Hendrick's letter to Lindsay was deemed to be an instruction to procure a bond without any limitation on whom the creditor(s) might be. *Id.* ("It is true that this promise, in terms, was to Lindsay; but there is no reason why it, any more than the request, should be limited. If the request applied, as we think it did, to the procurement of a sufficient bond, the promise has a like extent."). Hence, the quoted language upon which plaintiffs rely—though general when taken out of context—refers only to creditors, and stands only for the proposition that the state of the law at that time did not require promises made without seal to actually name the would-be creditor. Indeed, plaintiffs' assertion that Mansfield was a donee beneficiary is belied by the fact that even the quoted language refers to him as a "party," something that a donee beneficiary most assuredly is not. *See id.* at 149. This observation concerning Mansfield's status negates plaintiffs' second argument as well; it is not the relationship between Lindsay and Mansfield that the Court is describing, but the relationship between Mansfield (one of two promisees) and Hendrick (the promisor).

Finally, as *amicus* MML points out, the expressed views of Corbin and Williston on third-party donee beneficiaries are more complex than plaintiffs represent. First, both Corbin (a self-described advocate of permitting third-party donee beneficiaries

to sue, *see* Corbin, § 772 at 2–4) and Williston acknowledged that the common law right of donee beneficiaries to sue was a 20th Century development that altered the previous state of affairs. *See* Corbin § 772 at 4, § 782 at 81; Williston § 37:1 at 5, § 37:12 at 103, §§ 7:1, 7:10, 7:11. Second, both Corbin and Williston define third-party donee beneficiaries as recipients of gifts who have not endowed a benefit upon the parties related to the gift, a description completely at odds with Mansfield's status in *Hendrick;* Mansfield provided a bond in exchange for the promise of an indemnity. *See* Corbin § 774 at 6; Williston § 37:7 at 35, n.67. Finally, neither Corbin nor Williston actually describe Mansfield as a donee beneficiary; rather, both authors refer to the *Hendrick* case in their respective discussions of the overall development of third-party beneficiary law. *See* Corbin § 831 at 334, § 832 at 340–42, n.20; Williston § 37:11 at 89, 95–96, n.83, § 37:10 at 83–89, n.55. In short, plaintiffs have failed to proffer any persuasive historical evidence that third-party donee beneficiaries had a common law right to sue in 1871. Rather, the law presented to the court leads only to the conclusion that no such right then existed. In accordance with *Will*'s dictate that § 1983 be interpreted to reflect the "common-law principles" existing in 1871, the court finds that the statute affords third-party donee beneficiaries no right to sue the parties to the contract. Thus, § 1983 independently creates no right for beneficiaries of federal programs enacted pursuant to the Spending Power to sue the governmental entities or officers responsible for allocating those benefits. And even if one adopted the view of the state of the law surrounding § 1983's enactment that is most charitable to plaintiffs' interpretation, at best the feasibility of such donee suits would remain ambiguous, thereby falling short of the

"clear statement" required to impose upon a State a condition on the receipt of federal funds. *See, supra,* Part V.A.

## D. Any Rights, Privileges, or Immunities Created Under the Medicaid Statute are "Secured" By State, Not Federal Law.

Aside from the construction of § 1983 demanded by *Will,* suits brought by the intended beneficiaries of federal-state cooperative agreements created under the Spending Power appear to fall outside the text of § 1983 itself. "Section 1983 provides a federal remedy for 'the deprivation of any rights, privileges, or immunities *secured* by the Constitution and laws.'" *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 105, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989) (emphasis added). The statute provides a remedy "against all forms of official violations of federally protected rights," whether violative of the Constitution or a federal statute. *Id.* at 105–06, 110 S.Ct. 444 (internal citation and quotation omitted). But while § 1983 protects against violations of federal "rights, privileges, or immunities," it does not necessarily extend to protections against all violations of federal law. *Id.* at 106, 110 S.Ct. 444.

It may well be that the interests plaintiffs assert here under the Medicaid program are "rights, privileges, or immunities," but they are not "secured" by federal law. As is relevant here, the word "secure" means: "to put beyond hazard or losing or of not receiving: GUARANTEE $<\sim$ the blessings of liberty to ourselves and our posterity—*U.S. Const.*>." Webster's 3rd Int'l Dictionary (1976).[18] Under the ordinary meaning of the term, no interest is "secured" by the federal Medicaid statute. Upon its enactment, this federal law does not vest in a single American the right or privilege of receiving federally-

---

**18.** The optimal definition of the term "secure" would be from a dictionary published *circa* 1871, but this court does not have such sources available to it. There is no reason to believe, however, that this definition is incor-

rect, as it comports with the original understanding that individuals be enabled to sue to protect their federally-defined civil liberties. *See Will,* 491 U.S. at 66, 109 S.Ct. 2304.

subsidized medical care. As explained in Part III, *supra*, though passed by both houses of Congress and signed by the President, the Medicaid statute has no force of its own. It is only when a State, such as Michigan, accepts the Federal Government's offer and agrees to participate in the program that any benefits accrue to eligible individuals. Even if such accrual is characterized as a "right, privilege, or immunity," it is not one guaranteed by federal law by being put beyond hazard of losing or not receiving. If Michigan elects not to participate in the Medicaid program, Congress's intended beneficiaries will not be aided with federal funds. And if Michigan, after having elected to participate, decides that it no longer wishes to do so, eligible individuals in the State will again not receive the federal aid. All of this is entirely consistent with federal law; the Federal Government gives States an ongoing choice, and it is entirely the States' prerogative whether to participate. In short, it is not federal law that "secures" Medicaid rights (to the extent they might be so attributed), but state law. Section 1983 does not secure rights created under state law, and therefore is inapplicable to any such rights created under the Medicaid program.

## VI. Whether This Court's Rulings are Foreclosed by Precedent.

Plaintiffs assert that as a matter of binding legal precedent, suits brought pursuant to § 1983 against state officers for noncompliance with programs enacted under the federal Spending Power are permitted, and that numerous Supreme Court and Sixth Circuit opinions have held as much. In particular, they rely on *Rosado v. Wyman*, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980); *Wright v. City of Roanoke Redevelopment and Hous. Auth.*, 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987); and *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990). While acknowledging that the cases cited by plaintiffs involve the use of § 1983 by private parties to enforce federal legislation enacted pursuant to the Spending Power, Michigan notes that two other lines of Supreme Court authority—upon which this court relied in its foregoing analyses—have developed concurrently with those cases cited by plaintiffs. First, the Supreme Court has made clear that Spending Clause legislation is contractual in nature and may not be interpreted to impose duties or liabilities upon States absent a clear statement of congressional intent. *See, e.g., South Dakota*, 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987); *Pennhurst I*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). Second, the Court has specifically applied the clear statement requirement to the construction of § 1983 where Congress intends to alter the traditional constitutional balance between the States and the Federal Government, and determined that the clear statement rule applies with particular force to congressional Spending Power enactments. *Will*, 491 U.S. at 65, 109 S.Ct. 2304 (1989). In the absence of such clear statements, the common law as it existed in 1871 controls the interpretation of § 1983. *Id.* at 67, 109 S.Ct. 2304. No federal court, Michigan suggests, including the Supreme Court, has yet attempted to reconcile these divergent lines of authority.

This court has discussed at length the merits of Michigan's arguments and found them to be correct expositions of current controlling law as to the specific issues presented. What remains is for the court to consider whether plaintiffs are correct in asserting that such legal conclusions are precluded by other Supreme Court or Sixth Circuit precedent. An iteration of a few basic interpretive principles of what constitutes binding precedent is in order. To begin, when the Supreme Court assumes, *sub silentio*, questions of jurisdictions in a case, then it is not bound by those assumptions in subsequent cases. *See Will*, 491 U.S. at 63 n. 4, 109 S.Ct. 2304; *Hagans v. Lavine*, 415 U.S. 528, 533–35 n. 5, 94 S.Ct. 1372, 39 L.Ed.2d 577

(1974) (collecting cases); *United States v. More,* 3 Cranch 159, 7 U.S. 159, 172, 2 L.Ed. 397 (1805). Similarly, an assumption by the Court that a particular cause of action exists does not constitute a decision that it does. *See Burks v. Lasker,* 441 U.S. 471, 476 n. 5, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979); *Hagans,* 415 U.S. at 533 n. 5, 94 S.Ct. 1372. Finally, isolated statements in the Court's opinions that do not squarely address and resolve the issue mentioned also do not constitute binding precedent. *See Alden,* 527 U.S. at 735–38, 119 S.Ct. 2240. And though the conclusion seems obvious, where the Court has not definitively spoken to an issue, it remains an open question subject to interpretation by the lower federal courts. *See Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211, 229, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995).

Therefore, the Supreme Court's decisions—and for that matter, any court's decisions—decide only the legal issues that they specifically purport to decide. That there may be other assumptions, analyses, and language contained in those decisions may be of great utility for courts deciding future cases, but such conditions and language do not constitute binding precedent.

Upon turning to the cases upon which plaintiffs characterize as binding precedent, it appears that while the cases certainly lend support to plaintiffs' position, they have no binding precedential value as to the issues addressed in this opinion. For example, *Rosado,* the 1970 case that plaintiffs claim establishes their right to bring the instant cause of action under § 1983, says nary a word about sovereign immunity, *Ex parte Young,* the Spending Power, or, for that matter, § 1983 itself. Instead, *Rosado* addresses the substance of New York's implementation of the Aid to Families With Dependent Children program and the decisions made by the district court under the peculiar procedural posture of the case. The underlying (but unstated) assumption of the case is that the Court has jurisdiction, and that a cause of action exists, but the Court's opinion addresses neither issue. *Rosado,* then, does not illuminate the issues presented here.

Better support for plaintiffs' position is found in *Thiboutot, Wright,* and *Wilder. Thiboutot* held that as a general matter, § 1983 provides a right of action to enforce not only constitutional rights, but federal statutes, including those outside the realm of civil rights. *Wright* and *Wilder* effectively put the meat on *Thiboutot's* bare bones by establishing a three-pronged test for determining when a substantive federal statute creates a private cause of action that is enforceable under § 1983 (referred to hereafter as the *"Wright–Wilder"* test). In each of those three cases, the substantive federal statutes at issue were enacted pursuant to the Spending Power, but in none of the cases did the Court address the constitutional or statutory construction limitations on Congress in imposing such programs. Indeed, there is no better illustration than *Thiboutot* of assumptions in an opinion not necessarily reflecting the law. In that case, the Court assumed that the defendant State was a "person" under § 1983, an assumption later squarely rejected in *Will,* 491 U.S. at 66, 109 S.Ct. 2304. Likewise, *Alden* flatly rejected *Thiboutot's* assumption that a State's Eleventh Amendment immunity did not extend to suits in the State's own courts. 527 U.S. at 737, 119 S.Ct. 2240. The non-binding nature of "assumptions" similarly controls here. The fact that all three cases assumed § 1983 to automatically create a mechanism permitting suits against state officers for violations of Spending Power programs is simply not dispositive as to what the statute necessarily permits. Nor do the three cases provide insight as to the effect of sovereign immunity, *Ex parte Young,* or any other subjects neither mentioned nor ruled upon.[19]

---

**19.** The same holds true for the many cases from the Sixth Circuit and other courts proffered by plaintiffs in which § 1983 has been used to enforce "rights" created under feder-

However, speaking specifically to how § 1983 is to be construed for any cause of action, the Court in *Will* enunciated two important principles that are relevant here: (1) that it is to be construed in accordance with the common law as it existed in 1871; and (2) that it fails as a "clear and manifest" indication to impose a condition upon the States for the receipt of federal funds. *Id.* at 67, 65, 109 S.Ct. 2304 (internal citations omitted). In addressing the effect of § 1983 on federal-state programs enacted pursuant to the Spending Power, the Court could not have been more clear:

> In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has, in fact, faced, and intended to bring into issue, the critical matters involved in the judicial decision.

*Id.* at 65, 109 S.Ct. 2304 (internal citations and quotations omitted). *Will* holds that whatever else § 1983 may be, it is not by itself a "clear statement" demonstrating an intent to alter the federal-state balance. *Id.*

In shorthand form, one can think of the *Thiboutot–Wright–Wilder* trilogy as answering the question of how a court is to construe which substantive federal statutes

create "rights, privileges, or immunities" within the ambit of § 1983, while *Will* provides a framework for answering the enforcement question of who can be sued and what kinds of relief may be authorized under § 1983. Indeed, *Pennhurst I* made this very distinction between substantive rights and enforceability. 451 U.S. at 28 n. 21, 101 S.Ct. 1531.[20] Thus, the train of analysis as applied in the instant case may be summarized as follows: *Pennhurst I* and *South Dakota* require that if Congress intends to impose any condition on the receipt of federal funds by a State, that the condition be a "clear statement" expressed in unambiguous terms. *See Pennhurst I*, 451 U.S. at 9, 16, 101 S.Ct. 1531; *South Dakota*, 483 U.S. at 207, 107 S.Ct. 2793. The Medicaid statute contains no such clear statement requiring that either a State or its officers be subject to suit if the State fails to comply with the terms of the program. *Will* holds that § 1983 is itself not a clear statement that can impose conditions upon a State's exercise of its powers beyond those that existed in 1871. *Will*, at 65, 67, 109 S.Ct. 2304. No such right existed in 1871 at common law to sue a State or its officers for a failure to properly implement a governmental program. Hence, neither § 1983's express terms nor its historical construction autho-

al-state Spending Power programs against States or their officers; none of those have addressed any of the specific arguments raised here.

**20.** This court would be remiss in not acknowledging two post-*Wilder* Supreme Court cases in the § 1983/Spending Power program area. In *Suter v. Artist M.*, 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), the Court held that the federal-state Spending Power program at issue did not create rights enforceable by private parties under § 1983. The decision resulted in some confusion among the lower federal courts; for while the Court invoked the *Wright–Wilder* principles for determining whether a "right" enforceable by § 1983 exists, and also invoked *Pennhurst I*'s "clear statement" rule as a barrier against enforcing indiscreet statutory provisions against States, the Court's mode of

analysis left unclear whether *Wilder–Wright* remained the appropriate framework for making such determinations. However, five years later, in *Blessing v. Freestone*, 520 U.S. 329, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997), the Court reaffirmed the validity of the *Wright–Wilder* test when it rejected the enforceability under § 1983 of yet another federal-state Spending Power program provision. In that case, as alluded to earlier in this opinion, the question of whether third-party donee beneficiaries could bring suit under § 1983 was raised. Contrary to plaintiffs' assertions in the instant case, the majority opinion did not reject the argument, as it did not address it at all. *See Blessing*, 520 U.S. at 350, 117 S.Ct. 1353 (Scalia, J., concurring) (noting that the Court's ruling leaves open the possibility that third-party donee beneficiary suits do not lie under § 1983).

rizes such suits.[21] In the absence of any clear statement requiring submission by States or their officers to suit as a condition of receiving federal Medicaid funds, no such suit may be brought.

## VII. Other Arguments

■ A few remaining points warrant mention. First, plaintiffs suggest that by consenting to § 1983 suits in the past against its officers for alleged violations of the federal Medicaid program, Michigan has implicitly recognized that its officers are amenable to such suits. It should be remembered, however, that under both *Ex parte Young* and the statutory construction of § 1983, state officers retain the cloak of the State's sovereign immunity when implementing programs authorized by Congress under the Spending Power. And in *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 119 S.Ct. 2219, 2226, 144 L.Ed.2d 605 (1999), the Supreme Court squarely rejected the notion that a State could "impliedly" or "constructively" waive its immunity from suit based on its past behavior. As the Court further explained:

> [A] State's sovereign immunity is "a personal privilege which it may waive at its pleasure." *Clark v. Barnard*, 108 U.S. 436, 447, 2 S.Ct. 878, 27 L.Ed. 780 (1883). The decision to waive that immunity, however, "is altogether voluntary on the part of the sovereignty." *Beers v. Arkansas*, 20 How. 527, 529, 15 L.Ed. 991 (1858).

*Id.* There must be, the Court held, "a 'clear declaration' by the State of its waiver [ ] to be certain that the State in fact consents to suit." *Id.* at 2228. Hence, the fact that Michigan may have exercised its privilege in the past and consented to suit in other cases is irrelevant to the instant matter. In the absence of a clear declaration by Michigan in the case at bar that it has waived its sovereign immunity, and by extension, the immunity of its officers, it cannot be subjected to suit.

Another point warranting brief mention revolves around plaintiffs' supposition that the legislative history of the Medicaid Act and its subsequent amendments are demonstrative of Congress' intent that states participating in the Medicaid program be subject to private suit. For this supposition, they rely on *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), which reiterated the well-known proposition that in determining whether a given substantive federal statute is intended to create a private cause of action, legislative history must be considered. *Id.* at 694, 99 S.Ct. 1946. Plaintiffs are most assuredly correct in that assertion, as confirmed by the *Wright/Wilder* tripartite test for determining when Congress intended federal statutes to create a privately enforceable right. However, plaintiffs' argument misses the mark where either sovereign immunity or a clear statement rule is concerned. Both are here. As the Court has held:

> Waivers of ... sovereign immunity, to be effective, must be unequivocally expressed....[T]hey are not generally to be liberally construed....[T]he Government's consent to be sued must be construed strictly in favor of the sovereign, and not enlarged beyond what the language requires.

*United States v. Nordic Village*, 503 U.S. 30, 33–34, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992) (internal citations and punctuation omitted). The unequivocal expression eliminating sovereign immunity must be contained in the statutory text; if such

---

**21.** Though admittedly not necessary to the decision here, *amicus* MML suggests that *South Dakota* (or principles of contract interpretation) might even prohibit a general federal statute requiring that States subject themselves or the officers to suit as a condition for receiving federal funds for any program. *See South Dakota*, 483 U.S. at 207, 208 and n. 3, 107 S.Ct. 2793 (noting that conditions on federal grants might be illegitimate if unrelated to the purpose of the spending program at issue). Because § 1983 is not such a general authorization, there is no need for this court to address whether Congress might pass such a statute in lieu of doing so on a program-specific basis.

clarity does not exist, it cannot be inferred from the statute's legislative history. *Id.* at 37, 112 S.Ct. 1011. "Resort to legislative history is only justified where the face of the Act is inescapably ambiguous." *Garcia v. United States,* 469 U.S. 70, 76 n. 3, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984) (internal citation and quotation omitted). By definition, an "inescapably ambiguous" statute is also not a "clear statement" that "unambiguously" expresses congressional intent that a State or its officers be subject to suit. Hence, waivers of sovereign immunity cannot be accomplished by judicial construction from legislative history. The statute must speak for itself. Here, neither the Medicaid statute nor § 1983 contain such a statement, and Michigan and its officers thus retain their immunity from suit, and have not knowingly consented to private causes of action as a condition of participating in the Medicaid program.

Similarly, plaintiffs maintain that congressional silence in the face of repeated federal court decisions authorizing private causes of action under the Medicaid program against state officers requires a conclusion that such decisions are consistent with congressional intent. The argument is farfetched on its face; there is little or no institutional intent to be divined from congressional inertia, and courts are incompetent to do so. The reasons that Congress may choose to act or to refrain from acting are probably more numerous than its members, and there is no judicially-cognizable intent derivable from a political institution's failure to act. *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 186, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). As the *Central Bank* Court explained:

> [R]espondents infer that these Congresses, by silence, have acquiesced in the judicial interpretation of [the statute]. We disagree....[O]ur observations on the acquiescence doctrine indicate its limitations as an expression of congressional intent. It does not follow that Congress' failure to overturn a statutory precedent is reason for this Court

to adhere to it. It is impossible to assert with any degree of assurance that congressional failure to act represents affirmative congressional approval of the courts' statutory interpretation. Congress may legislate, moreover, only through the passage of a bill which is approved by both Houses and signed by the President. Congressional inaction cannot amend a duly enacted statute.

*Id.* at 186, 114 S.Ct. 1439 ("We walk on quicksand when we try to find in the absence of corrective legislation a controlling legal principle") (internal citations and punctuation omitted). Courts may attempt divine congressional intent only from what Congress does, not from what it does not do. That Congress has done nothing in response to court decisions assuming that particular causes of action exist provides no instruction as to whether they actually do; the answer lies in the statute. Here, the statute in question— § 1983—contains no such authorization.

Finally, the court mentions plaintiffs' reliance on *Bell v. New Jersey,* 461 U.S. 773, 103 S.Ct. 2187, 76 L.Ed.2d 312 (1983), for the proposition that so long as Congress makes clear a State's obligations under a joint program enacted pursuant to the Spending Power, Congress need not make clear how such obligations are to be enforced. Notwithstanding that Supreme Court cases such as *South Dakota* would have superceded such a rule, plaintiffs' interpretation of *Bell* fails to withstand scrutiny. In fact, the Court in *Bell* found that Congress had, consistent with *Pennhurst I,* been clear in the Spending Power statute at issue that the federal government could administratively recoup misspent funds from the State. *Id.* at 790 n. 17, 791, 103 S.Ct. 2187 (noting that the statute "clearly assigned" the auditing and recoupment powers to the Secretary of Education). Interestingly, it is this last of plaintiffs' arguments that suggests a resolution to the problem presented by this suit. None of the constitutional or statutory construction issues addressed here pre-

vent Congress from creating a private cause of action against States or their officers for failure to comply with federal-state contracts created pursuant to the Spending Power. Far from it. If Congress wishes to make states and/or their officers subject to private suit as a condition of receiving federal funds, it need only say so unequivocally in the statute authorizing the program.[22] Once faced with the "clear statement" that a condition of program participation is amenability to private suit, a State could make a "knowing" choice as to whether to participate. If it so chooses, then both parties to the contract will be clear as to its terms, including the means of redress for breach. A "clear statement" is all that is required.

## VIII. Conclusion

Because the Medicaid program at issue is the result of a voluntary contract between two sovereigns—Michigan and the Federal Government—it is not of the same legal nature as actions by the Federal Government in its capacity as the supreme sovereign compelling behavior by individual citizens. The terms of the agreement are set out in the Medicaid statute, which is enacted pursuant to the Constitution's Spending Power, and the obligations a State assumes as a result of its acquiescence are no greater than those expressly set forth in the statute. The constitutionally consensual nature of the contractual agreement means that unlike federal laws enacted pursuant to other constitutionally-enumerated powers, it is not the supreme law of the land. When state officers charged with carrying out these contracts do not act *ultra vires*, they are legally indistinguishable from the State, which is the only party to the contract, and they retain the State's constitutional sovereign

immunity from suit. Such is the case here. Moreover, the Medicaid program at issue here not only vests discretion in the implementing officers, but contains its own specific, congressionally-mandated remedies for its violations. For all of these reasons, the doctrine of *Ex parte Young* is unavailable to plaintiffs. Michigan and its officers retain their constitutional immunity from suit, and this court accordingly lacks jurisdiction.

The same result would obtain even if there were no infirmity of constitutional sovereign immunity depriving the court of jurisdiction. This is so because there is no cause of action available against Michigan or its officers. Where federal-state contracts enacted pursuant to the Spending Power are concerned, § 1983 operates as neither a cause of action against a State, even if the *Young* doctrine were applicable, nor as a voluntary waiver of a State's sovereign immunity where *Young* is inapposite. In order for Congress to impose a condition upon a State in return for receipt of federal funds, such a condition must be unambiguously set forth as a clear statement in the program statute. No such clear statement is contained in § 1983, the statute that plaintiffs claim grants them a private cause of action against the State's officers to enforce the terms of the Medicaid program. The statute's express terms contain no such language that would put a State on notice. And as a matter of historical statutory construction, which the Supreme Court requires in construing § 1983, no such clear, unambiguous intent to subject States to private suit may be found. Third-party donee beneficiaries lack standing to sue for the State's contractual breach under

---

**22.** Indeed, plaintiffs suggest that Congress has already done something similar on at least two occasions in reaction to Supreme Court decisions holding, on grounds other than those presented in the instant suit, that no private cause of action lay. *See* 42 U.S.C. § 1320a–2 (intended to overrule any legal effect in *Suter v. Artist M.* upon the previous *Wright/Wilder* test for evaluating whether pri-

vately enforceable rights were created by substantive federal statutes); 20 U.S.C. § 1415(1) (overruling the Court's decision in *Smith v. Robinson*, 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984), holding that the comprehensive scheme contained in the statute in question precluded private § 1983 actions to protect rights contained in the statute).

§ 1983. And § 1983 preserves not only the sovereign immunity of a State and its officers from suit for the State's contractual breach, but also recognizes that as agents of the State, officers may not be held to answer for their principal's contractual breach. Moreover, by its terms, § 1983 appears not to protect rights under Spending Power programs that are "secured" by state, rather than federal law. Finally, events outside the statute, such as a State's past voluntary submission to suit, legislative history, or congressional inaction, cannot be used to manufacture a "clear statement" within a Spending Power program statute to create an obligation upon a State that is not expressly contained in the statutory language. Simply put, § 1983 does not operate as "clear statement" imposing the obligation upon a State that it submit to private enforcement actions for violations of federal-state contract terms.

Strong democratic, federalism and federalism policy [23] concerns undergird these strictures. Congress is presumed to say what it means in the language of a statute. When courts are forced to guess at legislative intent, it increases the risk of laws being created that the people as ultimate sovereign had no intention of enacting. The risk doubles where two sovereigns are concerned. Here, it is not only the people of the United States as represented in the Federal Government, but the people of each individual State as represented by their legislatures and executive branches, whose consent is required. The Federal Government could have imposed the Medicaid program directly without the aid of the States, but it choose not to. Instead, it elected to offer a purely voluntary program in which each State was given the choice to participate. If that choice, exercised by the democratically-elected political branches of each State, is to be meaningful, all of the program participation conditions must be clear. It is the State, after all, that will bear the burden of implementation, as a matter of money, management, and diverted resources. In order for a State to effectively evaluate the "cost" (in the broad sense) of its participation, and to compare it with the expected "benefit" (both direct and psychic), then it must know exactly what the burdens will be. Whether it will be subject to suit by private plaintiffs, and have its treasury and officers at the mercy of a federal court, is surely an important consideration in deciding whether to participate. Such a burden is undoubtedly far more potentially onerous than an administrative denial of future funds by the Secretary of HHS. This is not to say that a State may not have such conditions imposed upon it, but is only to say that it must know unambiguously what those conditions are.

Nor are plaintiffs without recourse. For any medical services they allege to have been wrongfully denied, they may avail themselves of the internal administrative appeals process contained in the program. They may also exercise their First Amendment rights to petition the political actors responsible for this program: For example, they could request that the HHS Secretary cut off Michigan's funds for its asserted breach; they could lobby Congress to take similar steps by legislative means; furthermore, they can petition Michigan's legislature to create a cause of action permitting private suits against the State for its failure to comply with the Medicaid program terms; or they could lobby Congress to condition participation in the Medicaid program, or perhaps even all federal-state contracts, upon the States agreeing to submit to private causes of action for non-compliance with the contract terms. It is for the citizens of the respective sovereigns to decide through their elected representatives what the contours

23. "Federalism policy" here refers to the political philosophy that might animate a congressional decision to act or refrain from acting in these spheres, as compared to the concept of "federalism" that describes the very structure of the relationship between the federal government and the several states.

of governmental programs will be. And while permitting such causes of action against the States and their officers to enforce Spending Power programs might be desirable public policy, the law as it exists today does not authorize it.

For the foregoing reasons, Defendants' motion to dismiss is granted, and Plaintiffs' Motion for Class Certification is rendered moot, accordingly,

Plaintiffs' "Motion for Class Certification" is DENIED and

Plaintiffs' Complaint is DISMISSED WITH PREJUDICE.